538 S.E.2d 257

**The STATE, Respondent,**

v.

**Brian W. MANSFIELD, Appellant.**

No. 3247.

Court of Appeals of South Carolina.

Heard Sept. 12, 2000.
Decided Oct. 2, 2000.

68

Deputy Chief Attorney Joseph L. Savitz, III and Assistant Appellate Defender Melissa J. Reed Kimbrough, both of South Carolina Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh and Senior Assistant Attorney General Norman Mark Rapoport; and Solicitor Warren B. Giese, all of Columbia, for Respondent.

ANDERSON, Judge:

Brian W. Mansfield appeals from his convictions for attempted first degree burglary and unlawfully carrying a pistol. He argues the trial court erred in (1) denying his motion for a continuance; (2) allowing the State's primary witness to identify him; (3) excluding evidence showing another person committed the crime; and (4) refusing to allow the withdrawal of his guilty plea on the weapons charge. We affirm.

## *FACTS/PROCEDURAL BACKGROUND*

On the afternoon of September 2, 1997, Keith Diamond walked outside his house on Truman Street in Columbia. Diamond looked over at the home of his neighbor, Bernard James. He saw a man bending down on James' porch near the front door. Diamond initially thought the man was James because he could only see him from behind. However, as Diamond walked towards the fence between their yards, the

man stood up and Diamond realized he was not James because he was much too short.

The man was bending and pulling on James' locked screen door. Once the man opened it, he kicked the front door. Diamond yelled at the man to stop what he was doing and "looked him dead in the face," but the man did not respond. As Diamond approached him, the perpetrator walked away from James' home. Diamond continued to talk to the man. He did not get too close because the man had his hand under his shirt and Diamond feared he might be armed. James' burglar alarm sounded. Diamond watched the man walk down the street and noted where the man was headed. He then called 911.

In his call to 911, Diamond reported the attempted burglary and described the culprit.[1] He stated the individual was a light-skinned black male, between 5'5" and 5'6" tall, wearing a red jersey, tennis shoes, and short white pants. He said the man's hair was in plaits. Diamond informed the operator the man was walking toward the Bethel Bishop Apartment Complex.

When the police arrived at James' residence, they discovered "fresh damage" to the wooden front door. They found the latch from the screen door on a step leading to the porch and a shoe print on the porch.

Meanwhile, Officer Duren Lee Doughtery, one of the officers dispatched to the Bethel Bishop Apartment Complex, spotted Mansfield walking between apartment buildings. Mansfield was the only man Officer Doughtery saw who matched the description of the suspect. The officer stopped Mansfield and told him the police were investigating a problem on Truman Street. Mansfield said he had just come from that area but that he had done nothing wrong. After the officers notified him that he was under investigative detention, Mansfield ran. The officers found him a few minutes later hiding in a storage closet. He was wearing a red jersey, grey sweat pants[2] pulled up to his knees, and Timberland boots.

---

1. A 911 operator also received a call on James' burglar alarm.

2. Mansfield's sweat pants apparently were light grey in color. On the tape containing Diamond's 911 call and police conversations during the

He had an afro hairstyle. While booking Mansfield, officers recorded his height at 5'7". At that time, Mansfield provided the officers with a false name and two different addresses.

Officers transported Mansfield to the police substation where Diamond identified him as the man who attempted to break into James' house. Mansfield "made a voluntary statement that ... [Diamond] had seen him cutting grass on Truman Street when he was walking on Truman Street, crossing the railroad tracks." When an investigator confronted Mansfield with the evidence against him, he broke down crying, became despondent, and asked "Why do you need a confession with all the evidence that you have?" Police later discovered that the shoe print found on James' porch was consistent with the boots Mansfield was wearing at the time of his arrest.

Mansfield was charged with attempted burglary in the first degree and unlawful carrying of a pistol. His first trial, which was April 1–3, 1998, ended in a mistrial. Thereafter, on April 13, Mansfield's attempted burglary charge was again called for trial. At the beginning of the second trial, defense counsel moved for a two week continuance to obtain audiotapes of the earlier trial. The court denied the request. Defense counsel unsuccessfully attempted to (1) prevent Diamond from identifying Mansfield in court and (2) admit evidence that someone else committed the crime.

The jury convicted Mansfield of attempted burglary in the first degree. After the verdict, Mansfield pled guilty to unlawful carrying of a pistol. Defense counsel then attempted to withdraw the plea because he was confused and concerned about a new sentencing form he was required to sign. The court denied counsel's request, but agreed to pass sentence without the new form. The court sentenced Mansfield to one

search, one of the officers spotted Mansfield and described his pants as white sweat pants pulled up to his knees. The same officer later referred to the pants as whitish-grey. The officer who discovered Mansfield hiding in the storage closet referred to his pants as white in color. Diamond testified the pants looked white to him in the broad daylight. During her closing argument, the Assistant Solicitor referred to the sweat pants as "kind of grey" and argued they could be mistaken for white "in the September sun."

year on the weapons charge and thirty-five years on the attempted burglary.[3]

## ISSUES

I. Did the trial court err in denying Mansfield's motion for a continuance?

II. Did the trial court err in allowing Diamond to identify Mansfield as the perpetrator?

III. Did the trial court err in excluding evidence that another person committed the crime?

IV. Did the trial court err in refusing to allow Mansfield to withdraw his guilty plea?

## LAW/ANALYSIS

### I. Continuance

Mansfield argues the trial court erred in denying his motion for a continuance. Mansfield maintains he needed a continuance to obtain a trial transcript, which he could have used to impeach Diamond regarding the out-of-court identification.[4] He contends Diamond's testimony regarding the events surrounding that identification varied dramatically between the first and second trial and the transcript would have enabled him to prove the identification was the unreliable product of an unduly suggestive identification procedure. We disagree.

The granting or denial of a motion for continuance is within the sound discretion of the trial judge. *State v. Tanner*, 299 S.C. 459, 385 S.E.2d 832 (1989); *State v. Babb*, 299 S.C. 451, 385 S.E.2d 827 (1989). The trial court's refusal of a motion for continuance will not be disturbed on appeal absent a clear abuse of discretion resulting in prejudice to the appellant. *State v. Williams*, 321 S.C. 455, 469 S.E.2d 49 (1996); *State v. Babb*, 299 S.C. 451, 385 S.E.2d 827 (1989). *See also Skeen v. State*, 325 S.C. 210, 481 S.E.2d 129 (1997)(denial of motion for continuance rests within trial court's sound discre-

---

3. According to the briefs, the trial court later reduced the attempted burglary sentence to thirty years.

4. At trial, Mansfield alleged he needed a two week continuance to obtain the court reporter's tapes from the first trial.

tion and will not be disturbed on appeal absent abuse of discretion resulting in prejudice to appellant). Reversals of the refusal of a continuance are about as "rare as the proverbial hens' teeth." *State v. Lytchfield,* 230 S.C. 405, 409, 95 S.E.2d 857, 859 (1957).

■ Initially, we reject the argument that Diamond's testimony regarding the events leading up to his identification of Mansfield varied to such an extent from the first to the second trial to afford him a basis for effective impeachment.

During the first trial, Diamond gave the following *in camera* testimony about the show-up identification:

Q. —So I'm assuming then that there was a time when Investigator O'Neill took you someplace to identify a suspect; is that correct?

A. Well, after I gave him the—everything I know, what happened, then that's when he asked did I want to go see the guy. He said, "We've got him there." I said, "Yes, sir. I'd like to see him."

. . . .

Q. . . . When investigator J.J. O'Neill took you someplace, where did he take you?

A. He took me to the city police—little substation off of West Beltline.

Q. Okay. And how much time had occurred from when you very first saw the suspect to where investigator J.J. O'Neill took you to look at him later, approximately how much time?

A. Let's see. About maybe anywhere from about— Let's say around 15 or 20 minutes, something like that.

Q. 15 or 20 minutes from when you very first saw him?

A. Let me see. Wait a minute. I'm wrong. I don't— really, I don't exactly remember how much time was it [sic], to tell you the truth.

Q. Okay. Was it more than an hour?

A. No. It was less than an hour.

Q. It was less than an hour?

A. Right. It was less than an hour.

Q. Okay. And Investigator J.J. took you to the precinct?

A. Right.

Q. And did he tell you—What did he tell you about what you were getting ready to do? Did he tell you he was getting ready to let you look at somebody and ask you if that was the person—

A. He said—no. He said, "I want you to Identify"—He said, "We have a suspect."

Q. All right.

A. "We have picked up a suspect. I want you to identify him and make sure that's him."

Q. Okay. Did he suggest to you that they definitely had the man who did it?

A. Well, he said we have—the only thing he said, he said, "We have a suspect."

Q. Okay.

A. "And we want you to take a look at him."

Q. Okay.

A. That's exactly what he said. Those were his words.

Q. Okay. So when you went to the precinct, did this defendant come out?

A. Yeah, that's him.

Q. And you have no question that this man came out?

A. No doubt in my mind. That's him right there.

Q. Okay. Is this the same man that you saw on the porch?

A. That's the same guy I seen on Mr. James' porch.

During the *Neil v. Biggers*[5] hearing on retrial, Diamond testified concerning the events which occurred immediately prior to the show-up:

Q. And when the police took you to see him—I believe that was Investigator J.J. O'Neill; is that correct?

A. Yes.

Q. Did he tell you, We caught your man?

A. No. They say they got a suspect and they want me to take a look at him.

Q. Okay. Did he tell you what he would be wearing?

---

**5.** 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

A. No, he did not.

After the trial court determined his identification of Mansfield was reliable, Diamond gave the following testimony before the jury relating to the show-up:

Q. When ya'll got to the substation, what happened?

A. Well, they had—they brought us the guy out and before Officer O'Neill stopped his car, I had done pointed him out then, that is him, before he said anything to me.

Q. Did he tell you there's a man in the parking lot we want you to see?

A. No, he called ahead and he told—well, when we was on the way to the substation, he called and told them to bring the guy out. I'm bringing the witness who seen him here. So they brought him out, and before he said anything else to me, I had done pointed him out before he even stopped the car good, that is him.

Q. What was that man wearing?

A. The guy they brought out?

Q. Yes, sir?

A. The same clothes you just showed me, the red shirt and the white shorts.

Q. Are those the same clothes you saw initially?

A. The same clothes.

Q. Okay. Was that man by himself or with other people when you saw him at the substation?

A. I think two or three officers were with him.

Q. Officers?

A. Yeah.

Q. Were they standing around him?

A. Yes.

Q. Were there any other people who were not officers?

A. No.

Q. Okay.

A. Which I wasn't paying no attention, I didn't see no one else.

Q. You were looking at the suspect?

A. I was looking exactly at him, yes.

Q. Okay. Did you ask Investigator O'Neill for a better look of him?

A. No, I did not. I asked Officer O'Neill, Can I get out to touch him. I need to just touch him once.

Q. Why did you want to touch him?

A. Well, it made me so angry to see someone breaking in another person's house, you know, which I ain't never seen that happen before, not in the neighborhood I stay in. Which it probably have, but I didn't know nothing about it. And I wanted to just get out and touch him, not to be sure that that was him, because I know all the time in my mind that was him.

Q. Okay. Did you know that man prior to this incident?

A. The guy that did it?

Q. Yes, sir.

A. No, I do not know him.

Mansfield claims "Diamond's version of events leading up to his identification ... varied dramatically between the first and second trial." He asserts Diamond testified in the first trial that Investigator O'Neill stated: "[W]e've got him there.... I want you to identify him and make sure that's him"; where as, in the second trial, "[i]nstead of admitting that Officer O'Neill told him they had the perpetrator," Diamond testified he was told he was being brought to identify a *suspect.* We disagree.

Although Diamond initially testified in the first trial the investigator said police wanted Diamond to identify "him," he later clearly states the officer did not indicate they had caught the perpetrator but that they had a "suspect" for Diamond to identify positively or negatively. Diamond testified distinctly and firmly on this point during both the first and second trials. Although there are variances between Diamond's testimony in the first and second trials, these *minor* differences add to, rather than detract from, his credibility as a witness.

In *State v. Asbury,* 328 S.C. 187, 493 S.E.2d 349 (1997), the defendant requested a continuance when a case which originally ended in a mistrial was called for retrial and the transcript was not yet available. Asbury argued the transcript was necessary for the effective impeachment of witnesses. The trial court denied the motion, concluding the transcript would

have been beneficial, but was not essential. Our Supreme Court affirmed the trial court's ruling, finding Asbury failed to establish prejudice from the lack of access to the transcript from the first trial. The Court noted the court reporter's back-up tapes were available and could have been used for impeachment purposes as needed.

Here, as in *Asbury,* there was not enough time between Mansfield's mistrial and retrial for the preparation of a transcript. Unlike the *Asbury* case, Mansfield's attorney requested a copy of the court reporter's tapes by letter. However, in the letter, written a week before trial, defense counsel asked the court reporter to forward the tapes within *two weeks* even though the retrial was scheduled to commence only ten days after the mistrial.

Mansfield did not need a continuance to achieve his stated objective. He could have served the court reporter with a subpoena to appear in court and a subpoena *duces tecum* to bring the tapes with her. This would have provided Mansfield with the benefit of access to Diamond's prior testimony, which is precisely what he sought with his motion for a continuance.

We find the trial court did not abuse its discretion in denying Mansfield's motion for a continuance.

## II. Identification

Mansfield complains the trial court erred in allowing Diamond to identify him as the person who attempted to enter James' home. He avers Diamond's identification was the unreliable product of an unduly suggestive show-up procedure. We disagree.

■ The admissibility of evidence is within the sound discretion of the trial judge. *State v. Patterson,* 337 S.C. 215, 522 S.E.2d 845 (Ct.App.1999). Accordingly, evidentiary rulings of the trial court will not be reversed on appeal absent an abuse of discretion or the commission of legal error which results in prejudice to the defendant. *Id.*

■ A criminal defendant may be deprived of due process of law by an identification procedure that is unnecessarily suggestive and conducive to irreparable mistaken identification. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18

L.Ed.2d 1199 (1967); *Patterson, supra.* Identifications resulting from single person show-ups have been upheld by the United States Supreme Court and our Supreme Court. "While a showup in which a witness views a single suspect is generally suggestive, and hence suspect or disfavored, and less preferable than a lineup, even if requested by accused, a showup may be proper in some circumstances." 22A C.J.S. *Criminal Law* § 803 (1989) (footnotes omitted).

"[A] showup may be proper where it occurs shortly after the alleged crime, near the scene of the crime, as the witness' memory is still fresh, and the suspect has not had time to alter his looks or dispose of evidence, and the showup may expedite the release of innocent suspects, and enable the police to determine whether to continue searching." 22A C.J.S. *Criminal Law* § 803 (footnotes omitted). "The closer in time and place to the scene of the crime, the less objectionable is a showup." *Id.* "A showup may be proper even though the police refer to the suspect as a suspect, and even though the suspect is handcuffed or is in the presence of the police . . . ." *Id.* (footnotes omitted). "While show-ups have been upheld by the Court, these situations usually involve either extenuating circumstances or are very close in time to the crime." *State v. Hoyte,* 306 S.C. 561, 562–63, 413 S.E.2d 806, 807 (1992).

Single person show-ups are disfavored because they are suggestive by their nature. *State v. Blassingame,* 338 S.C. 240, 525 S.E.2d 535 (Ct.App.1999). However, an identification may be reliable under the totality of the circumstances even when a suggestive procedure has been used. *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Blassingame, supra.* Suggestiveness alone does not mandate the exclusion of evidence. *State v. Stewart,* 275 S.C. 447, 272 S.E.2d 628 (1980); *State v. Patterson,* 337 S.C. 215, 522 S.E.2d 845 (Ct.App.1999). Reliability is the linchpin in determining the admissibility of identification testimony. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Blassingame, supra.*

To determine whether an identification is reliable, it is necessary to consider the factors set forth in *Neil v. Biggers:* 1) the opportunity of the witness to view the criminal at the

time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the amount of time between the crime and the confrontation. *See Neil, supra; Stewart, supra; Blassingame, supra.* The corrupting effect of a suggestive identification is to be weighed against these factors. *Patterson, supra.* After the trial court determines the witness's identification is reliable, the witness is permitted to testify before the jury. *Id.*

Notwithstanding the suggestive nature of the identification procedure employed by police in this case, Diamond's identification of Mansfield was reliable in light of the totality of the circumstances. Diamond had a protracted opportunity to look at the man he witnessed trying to break into his neighbor's home. Diamond consciously observed the man. When he noticed the man stooping on the porch, Diamond first thought it was his neighbor. He realized this was not the case when the man stood up and Diamond saw the man was shorter than James.

Diamond yelled at the man and once "looked him dead in the face." He "[g]ot a good look at him" and "kept [his] eyes on [Mansfield] all the way." There were no distractions or visual obstructions which kept him from seeing the man. Furthermore, the attempted burglary occurred in the middle of the afternoon, when lighting was more than adequate. Diamond watched with bewilderment as the man did not respond, but simply walked off of the porch and down the street. He followed the man far enough to see him turn onto a different street and head toward an apartment complex across some railroad tracks. Diamond's attention was heightened as a result of the man's behavior.

The description Diamond gave to the officers matched, almost completely, Mansfield's appearance upon arrest. He described a man of Mansfield's race, height, and skin tone, who wore a shirt the same color as Mansfield's. Diamond stated the man wore white, short pants. When arrested, Mansfield was wearing grey sweat pants pushed up to his knees. Although Diamond described the perpetrator as having plaits in his hair and wearing tennis shoes while Mansfield

had an afro and wore boots, his description on the whole was accurate. Diamond explained Mansfield's hair looked like it had plaits in it because it was "packed down" rather than combed out. As for Mansfield's shoes, Diamond stated he did not pay much attention to the man's shoes because he was focusing on his clothes and face.

Furthermore, Diamond immediately and positively identified Mansfield upon being driven into the parking lot of the police substation. When asked how certain Diamond appeared to be when he identified Mansfield, Investigator O'Neill declared:

There was absolutely no doubt in his mind. As soon as we pulled in the parking lot and I pulled up to Mr. Mansfield, he pointed to him. He said, That's the man who did it, and he pointed. There wasn't any doubt whatsoever. It didn't take him anytime whatsoever to identify him. He was absolutely positive.

Investigator O'Neill recalled asking Diamond whether he was absolutely positive to which Diamond responded, "Undoubtedly, that's him." Diamond estimated he identified Mansfield less than an hour after first seeing him. *Critically, there was only a brief time between the crime and the identification. See State v. Hoyte,* 306 S.C. 561, 413 S.E.2d 806 (1992).

We hold Diamond's pre-trial identification of Mansfield was reliable under the totality of the circumstances. The identification satisfies the criteria of *State v. Stewart,* 275 S.C. 447, 272 S.E.2d 628 (1980), and *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The trial court properly denied Mansfield's motion to suppress Diamond's pre-trial identification of him. Additionally, the judge did not err in allowing the in-court identification.

### III. Exclusion of Evidence Regarding Guan Perry

Mansfield argues the trial court erred in not allowing him to admit evidence Guan Perry committed the attempted burglary. We disagree.

While searching for the man Diamond described in his call to 911, one of the officers mentioned a man named Guan.[6]

---

6. Just before Mansfield was found hiding in a storage closet, one of the police officers asked the other officers whether any of them knew a person named Guan who matched the description of the suspect.

Defense counsel repeatedly asked officers on cross-examination whether they had investigated any suspect named Guan, including asking the fingerprint expert whether he had compared the fingerprints found on James' door to Guan Perry's fingerprints.

At the close of the State's case, the defense requested permission to introduce a photograph and testimony that Perry, the man in the photograph, lived in the apartment complex where Mansfield was found and was there on the day of the attempted burglary. Mansfield proffered testimony of a private investigator that Perry lived in building 21–F of the Bethel Bishop apartments, that he is approximately 5'7" or 5'8", has a medium build, and light black skin. The investigator testified he talked with Perry. According to the investigator, Perry was at the apartment complex on September 2 and wore his hair in plaits during that month.

 Our Supreme Court has imposed strict limitations on the admissibility of third-party guilt. *State v. Cooper*, 334 S.C. 540, 514 S.E.2d 584 (1999). Evidence offered by a defendant as to the commission of the crime by another person is limited to facts which are inconsistent with the defendant's guilt. *State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999). The evidence must raise a reasonable inference as to the accused's innocence. *State v. Southerland*, 316 S.C. 377, 447 S.E.2d 862 (1994), *overruled on other grounds by State v. Chapman*, 317 S.C. 302, 454 S.E.2d 317 (1995).

In *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941), the defendant, a former officer of the Spartanburg Water Works department, appealed his conviction for embezzling funds from miscellaneous Water Works accounts. The trial court limited evidence of shortages and a cover-up involving a hospital's water account because that account was unconnected to the charges against defendant. The Supreme Court rejected Gregory's argument that the testimony concerning the hospital's account tended to prove another person committed the embezzlement of which he was accused. The Court articulated:

> [T]he evidence offered by accused as to the commission of the crime by another person must be limited to such facts as are inconsistent with his own guilt, and to such facts as raise

a reasonable inference or presumption as to his own innocence; evidence which can have (no) other effect than to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.... But before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party. Remote acts, disconnected and outside the crime itself, cannot be separately proved for such a purpose. An orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial does not contemplate that such defendant be permitted, by way of defense, to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that someone other than he is more probably guilty.

*Gregory,* 198 S.C. at 104–05, 16 S.E.2d at 534–35 (internal quotations and citations omitted).

After *Gregory,* the Supreme Court decided *State v. Parker,* 294 S.C. 465, 366 S.E.2d 10 (1988). Parker was convicted of murder and armed robbery. The victim was found dead at about 5:00 a.m. on a Saturday morning. He was tied to a fence. Several days later, an eyewitness reported to police that he had seen a white male bleeding against the fence where victim was found at approximately 4:15–4:25 a.m. The witness saw a second man there. He asked that man whether he knew where a party was and whether he had any marijuana. When the man answered negatively, the witness returned to his car and drove away. The witness gave a detailed description of the second man to police.

At trial, Parker sought to prove Rodney Fyall, the man who found the victim and reported the incident to the police, was the guilty party. After permitting a proffer of testimony, the trial judge denied Parker access to Fyall's psychiatric records. Further, the judge refused to allow Parker to query Fyall in regard to his boxer training, any aggressive or violent behavior traits, or whether he was questioned on the morning of the murder by an occupant of a car.

The Court ruled: "[T]he evidence proffered by [Parker] was not inconsistent with his guilt. The trial judge exercised sound discretion in excluding it." *Parker*, 294 S.C. at 467, 366 S.E.2d at 11.

The defendant in *State v. Southerland*, 316 S.C. 377, 447 S.E.2d 862 (1994), *overruled on other grounds by State v. Chapman*, 317 S.C. 302, 454 S.E.2d 317 (1995), was convicted of murder, kidnapping, and other crimes related to the violent killing, dismemberment, and burning of a woman. At trial, Southerland attempted to introduce evidence the victim was involved in a conspiracy to smuggle drugs into prison. He argued this evidence would have shown the victim's co-conspirators had a motive to murder her and, in turn, decreased the plausibility of his own guilt.

In affirming the trial court's exclusion of the proposed evidence, the Supreme Court enunciated:

> The evidence of [Victim's] involvement in a conspiracy to smuggle drugs into prison did not suggest any connection between the smuggling and [Victim's] death. At best, this evidence established that someone else may have had a motive to kill [Victim]. Motive is not a requirement of the State's case. Therefore, any evidence indicating that others had a reason to kill [Victim] would not exculpate Southerland. Evidence of the conspiracy to smuggle drugs into prison concerned only a remote act disconnected with the murder. We find that the trial judge exercised sound discretion in excluding this evidence.

*Southerland*, 316 S.C. at 383–84, 447 S.E.2d at 866–67.

*State v. Williams*, 321 S.C. 327, 468 S.E.2d 626 (1996), discusses the admissibility of third party guilt. Williams was convicted of murdering his wife and twelve-year-old adopted son. The victims were found inside the family van about six miles from their home. The front bumper of the van was against a tree, and fire had partially damaged the vehicle. The automobile accident had been staged. The accident scene and the autopsies revealed the victims were killed prior to the engineered car crash.

Approximately one month before the murders, Williams substantially increased life insurance benefits on Wife and Son, designating himself as beneficiary. In addition, Williams

upgraded existing policies with Allstate Insurance Company to include auto-related death benefits on both victims, forging his wife's name on the enrollment form.

At trial, Williams proffered evidence that there were marijuana manufacturers in the area where the bodies were found who had subsequently threatened the lives of a confidential informant and a narcotics agent. Williams asserted these men had the motive and opportunity to kill the victims. The Circuit Court refused to allow this evidence and argument of the theory before the jury. On appeal, Williams claimed he had been denied an opportunity to create a reasonable doubt of his guilt. The Supreme Court disagreed:

> After reviewing the record, we conclude that the evidence offered by Williams failed to establish that the persons arrested for growing marijuana had *any* connection whatsoever to the homicides. Hence, the drug offenses were isolated from the homicides, and evidence pertaining to them should not have been admitted to insinuate that someone other than Williams could have murdered the victims. Accordingly, because Williams failed to show that the proffered evidence was inconsistent with his guilt, the circuit court exercised sound discretion in excluding it.

*Williams*, 321 S.C. at 335, 468 S.E.2d at 631 (emphasis in original).

In *State v. Beckham*, 334 S.C. 302, 513 S.E.2d 606 (1999), the defendant was convicted of murder, kidnapping, and conspiracy to commit murder after his wife was found dead in her car in a ditch. The evidence demonstrated Beckham had beaten his wife unconscious with a gun. He then asked Richard Anderson, the person he hired to dispose of his wife's body, to break her neck. Beckham instructed Anderson to drive his wife's car off of a mountain road to make her death appear to be an accident. The victim's car did not roll as planned and ended up in a ditch.

Beckham attempted to introduce evidence in his trial that there were two men on the mountain road the night of the murder and that someone else had been with Anderson. The trial court's exclusion of this evidence was affirmed on appeal because the evidence Beckham sought to introduce regarding third party guilt would not have served to exculpate him.

Our Supreme Court, in *State v. Cooper*, 334 S.C. 540, 514 S.E.2d 584 (1999), addressed the issue regarding admissibility of third-party guilt. The victim was found dead in his home. Victim had been cut, stabbed, and slashed over seventy times. The police quickly suspected Cooper, who told officers three completely different stories during the investigation.

At trial, Cooper proffered the testimony of Solomon Nelson who testified that while in a restaurant, he overheard Shirley Gilmore tell Peter Wayne Marshall that Gilmore, Dottie Suber, and Cooper's girlfriend had murdered Victim. Marshall admitted having a conversation with Gilmore about the murder but denied that Gilmore told him she killed Victim. Marshall stated Gilmore simply told him that Cooper was not alone in killing Victim. Finally, Gilmore proffered testimony, denying she told Marshall that she killed Victim. Gilmore claimed she only told Marshall that she believed Cooper had not committed the crime. The trial court excluded the testimony.

On appeal, Cooper admitted the sole purpose for calling Gilmore was to impeach her with Nelson's testimony, thereby supplying substantive evidence of her guilt in committing the crime. The Court observed:

> [G]ilmore admitted having a conversation with Marshall concerning [Cooper's] case, but denied admitting to the crime. Aside from Nelson's assertions, there was no credible evidence linking Gilmore to Victim's murder. Gilmore testified *in camera* that she had never been to Victim's house. Thus, there was no evidence that tended clearly to point out that Gilmore was guilty of the crime. Nelson's testimony would therefore be prohibited under [*State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941)].

*Cooper*, 334 S.C. at 549–50, 514 S.E.2d at 589.

In the instant case, defense counsel attempted to show that a man named Guan Perry, who matched Diamond's physical description of the attempted burglar, lived in the apartment complex where Mansfield was found and was home on the day in question. This evidence casts a mere "bare suspicion" on Perry. The fact that Perry generally fit the description of the perpetrator and lived in the apartment complex does not show his guilt, nor is it inconsistent with

Mansfield's guilt. Because the evidence was not inconsistent with Mansfield's own guilt, the trial court exercised sound discretion in excluding it.

## IV. Refusal to Withdraw Guilty Plea

Mansfield maintains the trial court erred in ruling it could not exercise its discretion to allow the withdrawal of his guilty plea for unlawfully carrying a pistol. We hold the court properly exercised its discretion.

Once a defendant enters a plea of guilty, the decision whether to allow withdrawal of the plea is left to the trial court's sound discretion. *State v. Riddle*, 278 S.C. 148, 292 S.E.2d 795 (1982); *State v. Barton*, 325 S.C. 522, 481 S.E.2d 439 (Ct.App.1997); *State v. Rosier*, 312 S.C. 145, 439 S.E.2d 307 (Ct.App.1993). The failure to exercise discretion, however, is itself an abuse of discretion. *Samples v. Mitchell*, 329 S.C. 105, 495 S.E.2d 213 (Ct.App.1997). *See also Fontaine v. Peitz*, 291 S.C. 536, 538, 354 S.E.2d 565, 566 (1987)("When the trial judge is vested with discretion, but his ruling reveals no discretion was, in fact, exercised, an error of law has occurred."); *State v. Smith*, 276 S.C. 494, 498, 280 S.E.2d 200, 202 (1981)("It is an equal abuse of discretion to refuse to exercise discretionary authority when it is warranted as it is to exercise the discretion improperly.").

After the jury found Mansfield guilty of attempted burglary in the first degree, he pled guilty to unlawful carrying of a pistol. After the plea, but prior to sentencing, defense counsel indicated he was uncomfortable with a new sentencing form he was required to sign. He was unfamiliar with the form and unwilling to sign it. As a result, defense counsel moved to withdraw Mansfield's guilty plea. The record reflects the following colloquy:

The Court: You mean, the plea on the one year?

[Defense Counsel]: On the pistol charge, Your Honor. We just withdraw that at this time.

The Court: Well, I don't know how I can let you withdraw it. I've already accepted it now.

[Defense Counsel]: Well—

The Court: How can I let you withdraw something you've already voluntarily entered into?

[Defense Counsel]: It requires my signature and under these circumstances, I'm just not familiar with this form.

The Court: Well, I tell you what, don't sign it. You don't sign it and I'll sentence him without it. And we'll see what they do with that. The sentence on the pistol charge is one year. The sentence on the other charge he was just convicted on is 35 years. 35 years.

[Defense Counsel]: Thank you, Your Honor.

 Mansfield contends the trial court failed to exercise its discretion in refusing to allow the withdrawal of his guilty plea. We disagree. The court's comment and question concerning the request were merely rhetorical. The court did not misunderstand the law and thereby fail to exercise its discretion. Rather, the court, having already found Mansfield's guilty plea was voluntary, saw no reason to allow the plea to be withdrawn for the stated reasons. The court did exercise its discretion in refusing the request and fashioned a remedy to counsel's concerns, which Mansfield did not object to at trial or on appeal. We find no abuse of discretion.

## CONCLUSION

We find the trial court did not err in denying Mansfield's motion for a continuance. Further, we hold the court properly denied Mansfield's motion to suppress Diamond's pre-trial identification of him. Additionally, the judge did not err in allowing the in-court identification. Moreover, the court correctly excluded the proffered evidence concerning Guan Perry because it cast only a "bare suspicion" upon him and was not inconsistent with Mansfield's guilt. Finally, the trial court properly exercised its discretion in refusing to grant Mansfield's request to withdraw the guilty plea. Accordingly, Mansfield's convictions for attempted burglary in the first degree and unlawful carrying of a pistol are

**AFFIRMED.**

GOOLSBY and HUFF, JJ., concur.