606 S.E.2d 215

**The STATE, Respondent,**

v.

**Paris McLEOD, Appellant.**

No. 3897.

Court of Appeals of South Carolina.

Heard Nov. 9, 2004.

Decided Nov. 29, 2004.

---

Acting Chief Attorney Joseph L. Savitz, III, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Cecil Kelly Jackson, of Sumter, for Respondent.

ANDERSON, J.:

This case arises from a convenience store robbery, which resulted in the death of one of the store's owners and injury to the other owner. Paris McLeod appeals from his conviction for murder and sentence of thirty years imprisonment. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Perry Lloyd and his wife owned and operated the B & D convenience store in Rembert, South Carolina. On December 21, 1999, Lloyd was locking up the store for the evening after removing the day's proceeds. His wife was seated in the passenger seat of his truck parked in front of the store. When Lloyd turned from locking the front door, Rashaun Brooks, one of McLeod's codefendants, jumped around the corner of the store holding a gun and demanded that Lloyd "give it up." Lloyd initially thought it was a joke. However, Brooks fired his gun twice. Dropping the bag of money, Lloyd backed toward his truck.

Brooks retrieved the bag of money from the ground and said to Lloyd, "Didn't I say give it up?" Brooks shot again, this time in the direction of the truck. Lloyd observed McLeod emerge from the dark holding a shotgun. As Lloyd reached for his pistol, McLeod stumbled and the shotgun fired. The shot struck Lloyd in the leg. At the same time Lloyd was pulling his pistol, Jermaine Harris, McLeod's second codefendant, began shooting at Lloyd. Lloyd fired two

bullets from his pistol and, after Brooks fired two more shots, the three assailants ran.

Lloyd stood after the robbers fled, though he had multiple wounds to the legs. Lloyd testified he heard a bullet strike the truck during the shooting. When he checked on his wife in the truck, he discovered she had been wounded from a gunshot to the head. He stated he saw "the last breath and the blood running from her head." Lloyd went inside the store, called 911, and frantically sought help for his wife. Yet his wife's gunshot wound was fatal.

In his telephone call to 911, Lloyd explained he and his wife had both been shot. He advised the dispatcher that the suspects included McLeod. Lloyd referred to McLeod as P.J. on the 911 call and when he made his identification to Lieutenant Wesley Gardner. Additionally, he stated all of the suspects had weapons. When describing the individuals to the dispatcher, he stated: "Alright, I can't tell you exactly what the other ones had on, but I know P.J. All of 'em the same ones I have trouble with right here all the time."

One of the initial responding officers was Lieutenant Wesley Gardner, an investigator with the Sumter County Sheriff's Office. Lt. Gardner questioned Lloyd regarding the events. Lloyd declared he knew three of the attackers. He identified his attackers as McLeod, Brooks, and Harris. The identification of these three men was certain. However, Lloyd told Lt. Gardner that he saw shadows, so there may have been more individuals involved.

Shortly after the shooting, McLeod, Brooks, and Harris were arrested at a nearby residence. The police arrested Leroy Porter at the same time, but on an unrelated charge. Following his arrest, Porter offered to assist in retrieving the weapons used in the convenience store robbery and murder. The police were unable to find the guns in their first search attempt using Porter's information. Thereafter, Porter was asked to wear a wire to record a conversation between himself and Brooks in Brooks' jail cell. After reviewing the recorded conversation, the police located a rifle that was connected to the shells used during the convenience store robbery.

As corroborating evidence, the State presented the testimony of Lakeysha Nelson. Nelson informed the police she was

at a gathering with McLeod and Brooks shortly prior to the attack. Nelson stated Brooks had a gun and McLeod told Brooks "that he needed money," and "that they needed to rob somebody."

McLeod was thirteen at the time of the robbery and shootings. He was indicted for murder, armed robbery, assault and battery with intent to kill, possession of a weapon during the commission of a violent crime, first degree lynching, and second degree lynching. After hearings before the family court, jurisdiction was transferred to General Sessions court. All charges except the murder charge were remanded to the family court for consideration.

McLeod was tried with his codefendants. He was convicted of murder. The trial judge sentenced him to thirty years imprisonment.

### *STANDARD OF REVIEW*

 In criminal cases, the appellate court sits to review errors of law only. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Mattison*, 352 S.C. 577, 575 S.E.2d 852 (Ct. App.2003). This Court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000). The appellate court does not re-evaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial judge's ruling is supported by any evidence. *Mattison*, 352 S.C. at 583–84, 575 S.E.2d at 855.

 The admission or exclusion of evidence is left to the sound discretion of the trial judge. *State v. Gaster*, 349 S.C. 545, 564 S.E.2d 87 (2002); *State v. Horton*, 359 S.C. 555, 598 S.E.2d 279 (Ct.App.2004). A court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion or the commission of legal error which results in prejudice to the defendant. *State v. Hamilton*, 344 S.C. 344, 353, 543 S.E.2d 586, 591 (Ct.App.2001); *State v. Mansfield*, 343 S.C. 66, 538 S.E.2d 257 (Ct.App.2000). An abuse of discretion occurs when the trial court's ruling is based on an error of law. *State v. McDonald*, 343 S.C. 319, 540 S.E.2d 464 (2000); *State v. Adams*, 354 S.C. 361, 377–78, 580 S.E.2d 785, 793–94 (Ct.App.2003). In order for an error to warrant

reversal, the error must result in prejudice to the appellant. *See State v. Beck,* 342 S.C. 129, 536 S.E.2d 679 (2000); *see also State v. Wyatt,* 317 S.C. 370, 453 S.E.2d 890 (1995) (error without prejudice does not warrant reversal).

## *LAW/ANALYSIS*

### I. Rule 613(b), SCRE

■ During the trial, Lt. Gardner was questioned about whether he had entered into a prior agreement with Porter. Lt. Gardner denied making a statement that he made an agreement with Porter. Brooks sought to impeach Lt. Gardner by introducing evidence of a purported prior statement Lt. Gardner had made admitting he had entered into an agreement with Porter.

After removing the jury, the trial judge heard testimony regarding the circumstances of the prior statement. Brooks' trial counsel alleged the conversation between Lt. Gardner and Porter occurred at the solicitor's office. Brooks called Officer John Davis [1] who recalled a conversation occurring on the second floor of the law enforcement center. Davis said the term "agreement" was not specifically used but that Lt. Gardner agreed to take his cooperation into consideration. Davis alleged that the conversation took place in either December or January. After hearing the testimony, the trial judge sustained the State's objection and refused to allow Brooks to impeach Lt. Gardner. McLeod's counsel joined in the objection to the refusal to allow the impeachment evidence and the proffer of the evidence.

McLeod argues the circuit court erred when it did not allow him to impeach Lt. Gardner with his prior statement. We disagree.

Rule 613(b), SCRE, provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made, and is

---

[1]. Officer Davis is no longer employed with the Sheriff's Department, but worked as an investigator with the Department in December of 1999.

given the opportunity to explain or deny the statement. If a witness does not admit that he has made the prior inconsistent statement, extrinsic evidence of such statement is admissible.

The South Carolina rule differs from the federal rule in that a proper foundation must be laid before admitting a prior inconsistent statement. It is mandatory that a witness be permitted to admit, deny, or explain a prior inconsistent statement. Under Rule 613(b), extrinsic evidence of the statement is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made. Rule 613(b) explicates the procedure for impeachment by a prior inconsistent statement and requires laying the foundation. *See State v. Sierra,* 337 S.C. 368, 523 S.E.2d 187 (Ct.App.1999).

During questioning of Lt. Gardner about the alleged conversation, counsel asked whether he recalled a conversation that took place in the solicitor's office. Davis testified to a conversation which occurred in the second floor classroom of the law enforcement center. Finally, Davis could not testify to the statement or its meaning. Davis gave his own interpretation. He admitted the conversation could have been about a prior instance and may have involved other charges. Consequently, the trial judge did not abuse his discretion in excluding the testimony due to the failure to provide a sufficient foundation under Rule 613(b).

## II. Relevance

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Rule 403, SCRE; *see also State v. Cooley,* 342 S.C. 63, 69, 536 S.E.2d 666, 669 (2000) (although evidence is relevant, it should be excluded where danger of unfair prejudice substantially outweighs its probative value). A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. *State v. Horton,* 359 S.C. 555, 598 S.E.2d 279 (Ct.App.2004); *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). We review a trial judge's decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the

trial court's judgment. *State v. Hamilton,* 344 S.C. 344, 543 S.E.2d 586 (Ct.App.2001).

The trial judge determined the evidence would be more prejudicial than probative. The judge found the only way the State could contradict the evidence would be to call the solicitor as a witness. The individual who allegedly received a deal, Leroy Porter, did not testify at trial. He wore a wire to record a conversation with Brooks, which was played at trial. Brooks' words spoke for themselves. It is hard to discern what benefit there would have been for the jury to know the solicitor and Lt. Gardner agreed "to help him on some charges."

Additionally, any attempt to introduce the impeaching evidence to raise the issue of Porter's possible guilt in the crime is not a proper reason for its admittance. "Our Supreme Court has imposed strict limitations on the admissibility of third-party guilt." *State v. Mansfield,* 343 S.C. 66, 81, 538 S.E.2d 257, 265 (Ct.App.2000). "Evidence offered by a defendant as to the commission of the crime by another person is limited to facts which are inconsistent with the defendant's guilt." *Id.*

Given the minimal probative effect of the evidence, and its clear prejudicial effect, the trial court properly excluded the testimony under Rule 403, SCRE.

### III. Harmless Error

Any error arising from the exclusion of the evidence in the present case would be harmless.

Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey,* 355 S.C. 53, 584 S.E.2d 893 (2003); *State v. Pagan,* 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004). Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard,* 303 S.C. 172, 399 S.E.2d 595 (1991); *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App. 2003). Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989); *Adams,* 354 S.C. at 381, 580 S.E.2d at 795. The

admission of improper evidence is harmless where the evidence is merely cumulative to other evidence. *State v. Haselden,* 353 S.C. 190, 577 S.E.2d 445 (2003); *Pagan,* 357 S.C. at 146, 591 S.E.2d at 653.

In *State v. Fossick,* 333 S.C. 66, 70, 508 S.E.2d 32, 33–34 (1998), and *State v. Beckham,* 334 S.C. 302, 513 S.E.2d 606 (1999), the supreme court applied a harmless error analysis to the failure to allow impeaching testimony. In both cases, the court ruled that although the judge erred in not admitting the impeachment evidence, the error was harmless. The *Fossick* court concluded:

> In determining harmless error regarding any issue of witness credibility, we will consider the importance of the witness's testimony to the prosecution's case, whether the witness's testimony was cumulative, whether other evidence corroborates or contradicts the witness's testimony, the extent of cross-examination otherwise permitted, and the overall strength of the State's case. *State v. Holmes,* 320 S.C. 259, 464 S.E.2d 334 (1995) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

> Here, the main thrust of Shane's testimony was that he left appellant and Marilee about 1:30 p.m. on the day Marilee disappeared. This same information was admitted into evidence as part of a statement appellant made to police months before his confession that he was with Marilee at 1:30 p.m. that day when Shane saw them on the side of the road. Appellant's father also testified to this statement which appellant made to police in his father's presence. Accordingly, Shane's testimony was cumulative.

> Further, Shane's testimony was relatively unimportant to the State's case which rested on appellant's confession and the fact he led police to the murder weapon. In addition, appellant was permitted extensive cross-examination of Shane and impeached him with extrinsic evidence of conduct Shane denied. In light of all these factors, exclusion of Shane's prior inconsistent statement as impeaching evidence was harmless.

*Id.* at 70, 508 S.E.2d at 34. Citing *State v. Fossick,* the *Beckham* court held:

[H]ere, the trial judge erred in not admitting the impeach-
ment evidence but we find the error was harmless.
McCraw's testimony was not that important to the State's
case. Much of McCraw's testimony was merely cumulative
to Anderson's testimony and corroborated by other evi-
dence. The majority of McCraw's testimony was about the
phone records of appellant, appellant's father, Vickie's fa-
ther, Anderson, Anderson's employer (Smuggler's), and sev-
eral pay phones, and appellant's bank records. McCraw
also testified as to Anderson's statement and how he had
investigated the information contained in the statement.
Appellant was permitted to extensively cross-examine
McCraw. Lastly, the State's case was fairly strong.
Anderson's testimony and the evidence of flight were very
damning. After considering the Van Arsdall factors in light
of the evidence against appellant, we hold the exclusion of
this impeachment evidence was harmless.

*Id.* at 319, 513 S.E.2d at 614–15 (footnote omitted).

In the instant case, there was overwhelming evidence of
McLeod's guilt. Lloyd identified McLeod as one of the assail-
ants when he called 911. Specifically, he enounced: "Alright,
I can't tell you exactly what the other ones had on, but I know
P.J. All of 'em the same ones I have trouble with right here all
the time." Additionally, Lloyd was certain of McLeod's in-
volvement when he provided Lt. Gardner with a list of the
individuals involved in the shooting. Finally, during his testi-
mony, Lloyd stated unequivocally: "P.J. comes over from out
of the dark. When I looked up, I look right straight and I
seen him. I look straight down a gun barrel." Lloyd then
explained how he was shot by McLeod.

Additionally, the testimony of Nelson provided support for
McLeod's guilt. Nelson stated it was McLeod's idea to rob
someone, because he "needed money." She testified that
when most of the group left, McLeod, Brooks and Harris
stayed behind. These are the same three individuals later
identified by Lloyd as his assailants and his wife's murderers.

Finally, Lt. Gardner's main testimony was in regard to
Lloyd's identification of McLeod. Because this testimony was
cumulative to Lloyd's identification of McLeod without any
qualification, as well as the 911 tape, the error would be

harmless. *See Fossick*, 333 S.C. at 70, 508 S.E.2d at 33–34. Accordingly, even if there were an error in admitting the evidence, which we do not find, the error would be harmless given the overwhelming evidence against McLeod.

### CONCLUSION

The impeachment testimony sought to be introduced by McLeod was properly excluded because a foundation had not been laid pursuant to Rule 613(b), SCRE. Additionally, the testimony's prejudicial effect greatly outweighed its probative value. Finally, any possible error in its admittance was harmless given the strength of the State's case against McLeod and the cumulative nature of Lt. Gardner's testimony. Accordingly, McLeod's conviction and sentence are

**AFFIRMED.**

STILWELL and SHORT, JJ., concur.