634 S.E.2d 23

**The STATE, Respondent,**

v.

**Christopher Alan SANTIAGO, Appellant.**

**No. 4127.**

Court of Appeals of South Carolina.

Heard April 6, 2006.
Decided June 19, 2006.
Rehearing Denied Aug. 25, 2006.

154

156

Richard A. Harpootlian and M. David Scott, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Randolph Murdaugh, III, of Hampton, for Respondent.

HEARN, C.J.

Christopher Santiago appeals his convictions of murder and possession of a firearm during the commission of a violent

crime, alleging the trial judge erred in refusing to charge the jury on self-defense and in excluding testimony of a forensic psychiatrist. We affirm.

## FACTS

During the summer of 2002, Santiago and Kate Wisn lived together at the Hilton Head vacation home of Kate's parents. When Kate's father, Joe (hereinafter "Wisn"), visited Hilton Head in July, he informed Santiago that he and Kate needed to move out of the home within the next two weeks. That evening, Santiago left the home and drove to New Jersey to live with his parents. After a brief stay in New Jersey, Santiago returned to South Carolina and began renting an apartment near the vacation home.

According to Santiago, on the morning of August 9, 2002, he left his apartment with a 20–gauge shotgun in the trunk of his car with the intent to commit suicide. Before taking his own life, he called his parents to tell them goodbye. They convinced him to see his psychiatrist, who was able to talk Santiago out of committing suicide.[1]

When Santiago returned to his apartment, he had a message on his answering machine from Wisn, requesting that Santiago come to the vacation home to pick up some belongings. Upon his arrival at Wisn's home, Santiago saw his belongings packed in a container beside Wisn's car in the driveway. Santiago rummaged through the container in search of a favorite belt but was unable to find it. He rang the doorbell; Wisn answered, and the two men went inside to search for the belt.

According to Santiago, he began to cry while looking for the belt, and Wisn ridiculed him. At that point Santiago left the house, but Wisn followed him. Santiago testified that Wisn told him to "stay the f—away from my daughter." Santiago walked past the container of his belongings, but Wisn picked it up and walked around to the back of Santiago's car to place it in the trunk. After Santiago opened the trunk, Wisn placed the container into it and noticed the 20–gauge shotgun. Wisn looked at the shotgun, looked at Santiago, and then looked at

---

1. Santiago did not call his psychiatrist as a witness.

the shotgun again. Santiago testified he thought Wisn was about to grab the shotgun, so he took the gun from the trunk and pointed it at Wisn. Santiago took a step back. Wisn told Santiago "don't be f—ing stupid." Santiago testified he thought Wisn was about to reach for the gun so he opened fire. He shot Wisn four times, and Wisn later died from his wounds.

After fleeing the scene, Santiago drove to a fire station, and told the firemen that he shot someone on Hilton Head who had "ruined his life." A fireman called the police, and the police sent detective Leland Tuten to investigate. Detective Tuten provided Santiago with a *Miranda*[2] rights and waiver form, which Santiago initialed and signed. Tuten then provided Santiago with a pen and paper, and Santiago drafted a confession. In this confession, Santiago explained that while he lived with Kate, Wisn tried to turn her family members against him. He wrote he planned to marry Kate, but his plan fell through because Wisn kicked him out of the house. Santiago also admitted he shot Wisn four times with the shotgun. The confession went on to describe the shooting. Santiago said he was standing near the back of his car when he fired on Wisn, who was standing near the front of the car.[3] After Santiago confessed to the shooting, Tuten arrested him. Santiago was subsequently indicted for murder and possession of a firearm during the commission of a violent crime.

During trial, Santiago attempted to present testimony from Dr. Donna Schwartz–Watts, a forensic psychiatrist, who, prior to trial, had diagnosed Santiago with a condition called asperger's disorder, a subset of autism. Santiago argued Schwartz–Watts's testimony would be relevant to his mental state at the time of the shooting and would also support a finding that Santiago committed voluntary manslaughter rather than murder. The trial judge refused to allow her testimony into evidence, finding it was not relevant because South Carolina does not recognize the defense of diminished capaci-

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. According to the testimony of the forensic pathologist, the shots were fired from a distance of six to ten feet.

ty. The trial court also rejected Santiago's request to charge the jury with self-defense.

The jury convicted Santiago of murder and possession of a firearm during the commission of a crime. The judge sentenced Santiago to life imprisonment without parole.

## LAW/ANALYSIS

### I. Self–Defense Charge

Santiago first argues the trial judge erred in refusing to charge the jury on self-defense. We disagree.

■■■ An appellate court will not reverse the trial judge's decision regarding jury charges absent an abuse of discretion. *Clark v. Cantrell,* 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000); *State v. Williams,* 367 S.C. 192, 624 S.E.2d 443 (Ct.App.2005). If there is any evidence to support a jury charge, the trial judge should grant the requested charge. *State v. Burriss,* 334 S.C. 256, 262, 513 S.E.2d 104, 108 (1999). The refusal to grant a requested jury charge that states a sound principle of law applicable to the case at hand is an error of law. *Clark,* 339 S.C. at 390, 529 S.E.2d at 539. To warrant a reversal, however, the error must result in prejudice to the party requesting the charge. *Id.* A self-defense charge is not required unless the evidence supports it. *State v. Goodson,* 312 S.C. 278, 280, 440 S.E.2d 370, 372 (1994).

■■■ To establish self defense in South Carolina, four elements must be present: (1) the defendant was without fault in bringing on the difficulty; (2) the defendant actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) a reasonable, prudent person of ordinary fitness and courage would have entertained the same belief; and (4) the defendant had no other probable means of avoiding the danger of losing his life or sustaining serious bodily injury other than to act as he did. *Jackson v. State,* 355 S.C. 568, 570–71, 586 S.E.2d 562, 562 (2003); *State v. Day,* 341 S.C. 410, 416, 535 S.E.2d 431, 434 (2000). If there is any evidence of self-defense, the issue must be submitted to the jury. *State v. Burkhart,* 350 S.C. 252, 260, 565 S.E.2d 298, 302 (2002). In charging self-defense, the trial judge should consider the facts and circumstances of the case and fashion an

appropriate charge. *State v. Starnes,* 340 S.C. 312, 322, 531 S.E.2d 907, 913 (2000). The trial judge commits reversible error if he or she fails to give a charge on an issue raised by the evidence and requested by the defendant. *State v. Lee,* 298 S.C. 362, 364, 380 S.E.2d 834, 836 (1989).

Here, the record does not support a charge of self-defense for several reasons. First, the evidence does not support a finding that Santiago was without fault in bringing about the difficulty. Santiago had gone to Wisn's house with a loaded gun in his vehicle, and that weapon was apparently observed by Wisn as he lifted Santiago's belongings into the car. Although Santiago asserted that Wisn verbally berated him as he looked for his favorite belt, these words were never accompanied by a hostile act. While we recognize that, depending on the circumstances, words accompanied by hostile acts may establish self-defense, there was no evidence of a hostile act by Wisn. *See State v. Fuller,* 297 S.C. 440, 444, 377 S.E.2d 328, 331 (1989); *State v. Harvey,* 220 S.C. 506, 518, 68 S.E.2d 409, 414 (1951) ("[W]here death is caused by the use of a deadly weapon, words alone, however opprobrious, are not sufficient to constitute a legal provocation.").

Santiago argues the hostile act occurred when Wisn looked at the gun, looked at Santiago, and then looked at the gun again. This bare assertion is insufficient to establish a hostile act by Wisn. Santiago never claimed Wisn made a move for the gun before Santiago took it from the trunk. Even assuming, as Santiago testified, that Wisn reached for the gun while in Santiago's hands, he did so after Santiago brought about the difficulty by removing the shotgun from the trunk and aiming it at Wisn.[4] Therefore, no question of fact for the jury is created on the first prong of self-defense.

While Santiago asserts he actually believed he was in imminent danger, the third prong of self-defense cannot be established because a reasonable, prudent person of ordinary fit-

---

4. This is not a case where Santiago was justified in using deadly force before his adversary could "get the drop on him." In *Starnes,* 340 S.C. at 322, 531 S.E.2d at 913, and *State v. Hendrix,* 270 S.C. 653, 661, 244 S.E.2d 503, 507 (1978), the defendant's adversary was already armed, or the defendant believed his adversary was already armed, when the defendant fired. Here, there is no indication that Wisn was armed or that Santiago believed otherwise.

ness and courage would not have feared for his life or serious bodily injury under the circumstances of this case. Santiago testified that he and Wisn had never had a physical altercation, nor had Wisn ever threatened to kill or cause serious injury to Santiago before the shooting. Additionally, the evidence, taken in the light most favorable to Santiago, demonstrates that Wisn merely looked at the shotgun, looked at Santiago, and then looked at the shotgun again. Accordingly, no reasonable person would have feared for his life simply because of Wisn's actions of looking. Therefore, no question of fact for the jury is created on this element of self-defense.

■■■ Finally, the fourth prong of self-defense cannot be satisfied because Santiago had other probable means of avoiding the danger. If the defendant provokes or initiates the assault, he cannot invoke self-defense; however, he may restore his right to self-defense if he withdraws from the conflict and communicates that decision to his adversary. *State v. Bryant*, 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999). Because Santiago was not on his property, he had a duty to retreat. *See Fuller*, 297 S.C. at 444, 377 S.E.2d at 331. Taken in the light most favorable to Santiago, the record indicates that when Wisn was shot, Santiago stood at the back of his car and Wisn stood in the front. Due to the distance between the two men at the time of the shooting, Santiago could have retreated with the shotgun rather than shooting Wisn. Moreover, Santiago simply could have avoided the danger by closing his trunk. *See Bryant*, 336 S.C. at 345, 520 S.E.2d at 322 (stating appellant easily could have avoided the conflict by leaving the open parking lot where the situation arose). Further, because Wisn was unarmed, Santiago had multiple opportunities to escape his perceived peril without resorting to firing his weapon, let alone firing it four times. Therefore, no question of fact for the jury is created on this prong of self-defense.

Because the record demonstrates as a matter of law the absence of at least one element of self-defense, the trial judge did not err in refusing to charge self-defense.

## II. Dr. Schwartz–Watts's Testimony

■■■ Santiago next argues the trial judge erred in refusing to allow Schwartz–Watts to testify that because of Santiago's

asperger's disorder he did not have the requisite mental state to commit murder nor the ability to provide a voluntary confession. Santiago attempted to call Schwartz–Watts as a witness during his case, but the trial judge refused to allow the testimony. We find no reversible error.

The admission or exclusion of evidence is left to the sound discretion of the trial judge. *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002); *State v. Horton*, 359 S.C. 555, 566, 598 S.E.2d 279, 285 (Ct.App.2004). A trial judge's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. *State v. Mansfield*, 343 S.C. 66, 77, 538 S.E.2d 257, 263 (Ct.App.2000). An abuse of discretion occurs when the trial judge's ruling is based on an error of law. *Id.* For an error to warrant reversal, however, the error must result in prejudice to the appellant. *Id.* Evidence is relevant if it has "any tendency to make[ ] the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. An expert witness qualified by knowledge, skill, experience, training, or education may testify to assist the jury in understanding the evidence or determining an issue before them. Rule 702, SCRE.

### A. Santiago's Mental State During the Commission of the Crime

On appeal, Santiago argues the trial court erred in refusing to allow the testimony of Schwartz–Watts because the evidence was relevant to Santiago's mental state, both at the time he made the statement to police and at the time of the shooting. At trial, defense counsel offered Schwartz–Watts as an expert witness to testify that Santiago's asperger's disorder caused him to fear for his life, and accordingly, Santiago did not have the requisite mental state to commit murder. Essentially, defense counsel argued that Santiago was culpable of a lesser offense because of his diminished capacity. However, the diminished capacity defense is not recognized in South Carolina. *Gill v. State*, 346 S.C. 209, 220, 552 S.E.2d 26, 32 (2001). In *Gill*, defense counsel wanted a forensic psychiatrist to testify that because Gill had a low IQ, he did not have the requisite mental state to commit murder. The supreme court

held the trial judge properly excluded this testimony because South Carolina does not recognize the diminished capacity defense. Thus, the trial judge did not commit an abuse of discretion when she refused to allow Schwartz–Watts to testify regarding Santiago's diminished capacity.

## B. Voluntariness of Santiago's Statements to Police

Santiago also argues that Schwartz–Watts's testimony was relevant to his mental state at the time he made the statement to the police. Initially, we question whether this issue is preserved for our review.

As a general rule, if an issue was not raised and ruled upon below, it will not be considered for the first time on appeal. *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003); *State v. Passmore*, 363 S.C. 568, 584, 611 S.E.2d 273, 281 (Ct.App.2005). Our courts have "consistently refused to apply the plain error rule." *Jackson v. Speed*, 326 S.C. 289, 306, 486 S.E.2d 750, 759 (1997) (citations omitted). Instead, "it is the responsibility of counsel to preserve issues for appellate review." *Id.* Moreover, a proffer of testimony is required to preserve the issue of whether testimony was properly excluded by the trial judge, and an appellate court will not consider error alleged in the exclusion of testimony unless the record on appeal shows fairly what the excluded testimony would have been. *State v. Roper*, 274 S.C. 14, 20, 260 S.E.2d 705, 708 (1979); *State v. King*, 367 S.C. 131, 136, 623 S.E.2d 865, 868 (Ct.App.2005).

Here, the trial court conducted a *Jackson v. Denno*[5] hearing prior to trial. In that hearing, Santiago challenged the voluntariness of the statements made shortly after the shooting; however, at no point in the hearing did Santiago offer the testimony of Schwartz–Watts on the issue of how his asperger's syndrome affected the voluntariness of his statement. As the trial proceeded, Santiago sought to introduce the testimony of Schwartz–Watts prior to his own testimony. The trial judge stated such testimony would be premature until after Santiago testified if he chose to do so. However, the trial judge stated: "It is my understanding, based on the

---

5. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

information I have had the benefit of in chambers, that counsel would have intended to call Dr. Schwartz–Watts for the purpose of describing or explaining Mr. Santiago's mode of communications, mode of testifying, why he projects himself as he does." Neither prior to nor in response to this statement by the court, did Santiago raise the issue of how Schwartz–Watts's testimony would impact the voluntariness of his confession.

After Santiago testified, the trial judge found the testimony of Schwartz–Watts was inadmissible but allowed Santiago's counsel to proffer his arguments for the record. Counsel for Santiago stated three reasons for Schwartz–Watts's testimony:

My intent, originally, for calling her was ... while [Santiago] is ordinary and reasonable, he has this developmental disorder ... that effects his individual perception.

. . .

My second aspect of calling Dr. Schwartz–Watts would be to comment on his mental state as per it would relate to provocation and heat of passion under a charge for voluntary manslaughter.

. . .

The third and final proffer would be for her to explain [Santiago's] affect and appearance in court and dealing with his issuing a statement as he did based on his perceptions of his not being treated well, being messed with, his rights being violated, et cetera, et cetera. That's the entire proffer for the record.

It is apparent from the proffer that Schwartz–Watts would have testified as to Santiago's mental capacity, his perceptions at the shooting, his in-court demeanor, and his mental state as it relates to voluntary manslaughter. Although defense counsel mentioned Santiago's "issuing a statement as he did," counsel never argued Schwartz–Watts's testimony would be relevant to the jury's determination of whether Santiago's confession was voluntary. Santiago only sought to introduce Schwartz–Watts's testimony on issues related to mental capacity, not on the issue of voluntariness, and the trial court never ruled on the admissibility of Schwartz–Watts's testimony on the issue of voluntariness. Therefore, the issue is arguably not preserved for our review.

■■■ Moreover, even if the issue was preserved for our review, we find any error in failing to allow Schwartz–Watts to testify to be harmless. *See State v. Miller,* 367 S.C. 329, 332, 626 S.E.2d 328, 332 (2006) (explaining that an error is harmless when it could not reasonably have affected the result of the trial). Even without Santiago's written confession, there is overwhelming evidence of Santiago's guilt. Shortly after the shooting, Santiago turned himself in at the fire station where he told the firemen present that he just shot someone on Hilton Head, and that the weapon used in the shooting was in his car. Furthermore, Santiago testified at trial that he shot Wisn on the day in question. This is not a case where the perpetrator's identity is at issue or where Santiago's confession was a pivotal piece of evidence against him. Therefore, even if the trial judge erred in declining to allow Schwartz–Watts to testify about how Santiago's syndrome affected the voluntariness of his statement, the error was harmless given the overwhelming evidence of Santiago's guilt.

## CONCLUSION

For the aforementioned reasons, Santiago's conviction is hereby

**AFFIRMED.**

KITTREDGE, J., concurs.

ANDERSON, J. (dissenting in a separate opinion):

I disagree with the reasoning and analysis of the majority. I **VOTE** to **REVERSE.**

### I.  Self–Defense

I agree with Santiago that the trial judge erred in refusing to charge the jury on self-defense. The evidence supports a self-defense charge.

To establish self-defense, a defendant must show: (1) he was without fault in bringing on the difficulty; (2) he actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) a reasonable, prudent person of ordinary fitness and courage would have entertained the same belief; and (4) the defendant had no other probable

means of avoiding the danger of losing his life or sustaining serious bodily injury other than to act as he did. *Jackson v. State,* 355 S.C. 568, 570–71, 586 S.E.2d 562, 562 (2003); *State v. Day,* 341 S.C. 410, 416, 535 S.E.2d 431, 434 (2000); *State v. Bryant,* 336 S.C. 340, 344–45, 520 S.E.2d 319, 321–22 (1999); *State v. Wiggins,* 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998); *State v. Long,* 325 S.C. 59, 62, 480 S.E.2d 62, 63 (1997); *State v. Bruno,* 322 S.C. 534, 536, 473 S.E.2d 450, 451 (1996); *State v. Goodson,* 312 S.C. 278, 280, 440 S.E.2d 370, 372 (1994); *State v. Hill,* 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993); *Robinson v. State,* 308 S.C. 74, 79, 417 S.E.2d 88, 91 (1992); *State v. Fuller,* 297 S.C. 440, 442, 377 S.E.2d 328, 330 (1989); *State v. Davis,* 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984); *State v. Hendrix,* 270 S.C. 653, 657–58, 244 S.E.2d 503, 505 (1978); *State v. Slater,* 360 S.C. 487, 491, 602 S.E.2d 90, 91 (Ct.App.2004).

Depending on the circumstances, words accompanied by hostile acts may establish self-defense. *Fuller,* 297 S.C. at 444, 377 S.E.2d at 331; *State v. Harvey,* 220 S.C. 506, 518, 68 S.E.2d 409, 414 (1951), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) (abrogating the doctrine of in favorem vitae); *State v. Mason,* 115 S.C. 214, 217, 105 S.E. 286, 286 (1920) ("Words accompanied by hostile acts may, according to the circumstances, not only reduce a killing from murder to manslaughter, but may establish the plea of self-defense."). The defendant does not have to wait until his adversary is on equal footing in order to act; "he has the right to act under the law of self-preservation and prevent his [adversary from] getting the drop on him." *State v. Starnes,* 340 S.C. 312, 322, 531 S.E.2d 907, 913 (2000); *Hendrix,* 270 S.C. at 660, 244 S.E.2d at 507; *State v. Rash,* 182 S.C. 42, 50, 188 S.E. 435, 438 (1936).

If the defendant provokes or initiates the assault, he cannot invoke self-defense; however, he may restore his right to self-defense if he withdraws from the conflict and communicates that decision to his adversary. *Slater,* 360 S.C. at 491, 602 S.E.2d at 92–93. Firing multiple shots does not necessarily negate self-defense so long as the defendant is justified in "continuing to shoot until it is apparent that the danger to his life and body has ceased." *Hendrix,* 270 S.C. at 661, 244 S.E.2d at 507 (holding self-defense was established even

though defendant fired four times in rapid succession). Furthermore, the unlawful possession of a firearm does not automatically bar a self-defense charge. *State v. Burriss*, 334 S.C. 256, 262, 513 S.E.2d 104, 108 (1999).

If a self-defense charge is warranted, the trial court should consider the facts and circumstances of the case and fashion an appropriate charge. *Starnes*, 340 S.C. at 322, 531 S.E.2d at 913; *Fuller*, 297 S.C. at 443, 377 S.E.2d at 330. "A self-defense charge is erroneous where the trial court fails to charge on elements of the defense which were applicable to the issues raised by the defendant." *Day*, 341 S.C. at 418, 535 S.E.2d at 435.

Several South Carolina appellate cases are instructive on when evidence is sufficient to require a charge on self-defense. In *State v. Hill*, 315 S.C. 260, 433 S.E.2d 848 (1993), Veronica Hill was present outside a nightclub when a fight broke out. One of the fighters gave Hill a handgun, which she fired in the air when the fight escalated. "The victim, a spectator to the fight, jumped Hill from behind and began wrestling for the weapon. The scuffle ended when Hill and victim turned face to face and the gun fired." 315 S.C. at 261, 433 S.E.2d at 848–49. The trial judge refused to charge on self-defense, and the jury convicted Hill of voluntary manslaughter. The supreme court held there was evidence to support a self-defense charge and reversed:

> The relevant question for the Court to answer is whether there is any evidence in the record which would support a self-defense charge. The record shows that Hill fired the gun into the air when several of her friends began fighting, and that the shot was fired to stop the fighting. It was this gunshot which prompted the victim to attempt taking the gun away from Hill. The victim, a larger person than Hill, came up behind Hill and grabbed her by "the throat." There was also evidence to support the proposition that after a violent struggle, the victim "lost her grip" on the gun and was shot.
>
> This evidence shows that Hill may not have been responsible for bringing about the difficulty which resulted in the victim's death. Further, the record supports the conclusion that the struggle alone was some evidence that Hill was in

fear or imminent danger of losing her life or sustaining serious bodily injury. The method of victim's attack from behind is evidence that Hill was attempting to retreat, and that Hill had no means of avoiding the danger. The size differential between Hill and the victim is evidence which would allow a reasonably-prudent individual of ordinary firmness and courage to entertain the same belief about the danger.

In reviewing the record, it appears that there was ample evidence to support a self-defense charge to the jury. Therefore, the trial judge erred in not granting Hill's request to charge self-defense to the jury.

*Hill*, 315 S.C. at 262–63, 433 S.E.2d at 849.

*State v. Bruno*, 322 S.C. 534, 473 S.E.2d 450 (1996), involved a trial court's refusal to charge on self-defense. A jury convicted Bruno of murder for shooting the victim, James Murphy. Bruno argued the trial court erred by refusing his additional charge on self-defense: that he had no duty to retreat if retreating would place him in danger. The supreme court, however, found that Bruno was not entitled to a charge on self-defense at all.

Bruno was not entitled to a self-defense charge, because he presented no evidence that he believed he was in imminent danger of losing his life or sustaining serious bodily injury. On direct examination, his only testimony was that he felt Victim was coming at him with something. He testified, "It happened so quick, you know. I didn't mean to kill him. I just wanted him to keep away from me." Furthermore, when asked what was his intention in firing the weapon, Bruno responded, "Just let him know to try to stay away from me and not mess with me." On cross-examination, Bruno stated that Victim was "getting in his trunk and he came towards me and something snapped and I shot him."

Since Bruno presented no evidence ... that he believed he was in imminent danger of losing his life or sustaining serious bodily injury, he fails the second element of self-defense. *See State v. Goodson*, 312 S.C. 278, 440 S.E.2d 370 (1994). Accordingly, the trial court's failure to charge no

duty to retreat was not in error as Bruno was not entitled to a self-defense charge.

*Bruno,* 322 S.C. at 536–37, 473 S.E.2d at 452 (footnote omitted).

The supreme court, in *State v. Bryant,* 336 S.C. 340, 520 S.E.2d 319 (1999), affirmed the trial court's refusal to give the jury a self-defense instruction. Lavar Bryant admitted to killing the victim, but gave several conflicting statements of the events. The victim, a DHEC employee, approached Bryant in the DHEC parking lot as Bryant was breaking into the victim's car. Bryant had a knife, but dropped it and instead stabbed the victim several times with a screwdriver. The *Bryant* court found a self-defense charge was properly declined.

> Appellant's statements fail to establish the elements of self-defense entitling appellant to a self-defense charge. No question of fact for the jury is created on this issue. Appellant concedes he brought on the initial difficulty by breaking into Suber's vehicle. Even if appellant subjectively meant to withdraw from the conflict he failed to communicate this intent to Suber. Although in one statement appellant claimed he dropped the knife because he did not want to fight, appellant admitted Suber did not see him drop the knife. Thus, Suber was unaware of appellant's intent to withdraw from the conflict. Further, appellant never told Suber he was leaving and did not want to fight. If appellant truly intended to withdraw he could have easily left the open parking lot. *See Macias v. State,* 36 Ariz. 140, 283 P. 711 (1929) (a man who is a trespasser and in a place where he has no right to be may not stand his ground and slay his assailant and still claim self-defense, when by leaving such place he might avoid the conflict). Because appellant failed to effectively communicate to Suber his intent to withdraw from the conflict, appellant's right to use self-defense was never restored. Appellant, as the aggressor, remained responsible for bringing on the difficulty.

*Bryant,* 336 S.C. at 345–46, 520 S.E.2d at 322.

In *State v. Day,* 341 S.C. 410, 535 S.E.2d 431 (2000), the supreme court reversed Raymond Day's murder conviction for, among other reasons, the trial court's failure to charge

self-defense. The victim, Wayne Renew, had hired Day to kill Renew's ex-girlfriend, Debra Bouchillon. Day was to murder Bouchillon and meet Renew on a dirt road after the killing. However, Day, who previously had been romantically involved with Bouchillon, had a change of heart. He did go to Bouchillon's home, but he informed her of the conspiracy and made an anonymous phone call to the police regarding the plot. Day and Bouchillon decided to meet Renew on the dirt road so that Renew would believe Day had gone through with the murder. Bouchillon rode along, but hid in the back seat of the car under several blankets. Day informed Renew he had killed Bouchillon. The two returned to their cars and drove away. Day followed Renew, and Renew stopped his car and motioned to Day. At this point

> Day became frightened because he thought Renew had figured out he had been duped. According to Day,

>> I was talking to Wayne listening to what he said and looking, and then I just caught it out of the corner of my eye, the blankets coming up and came up and went down real quick and I saw Mr. Renew reach for a gun ... and I saw Mr. Renew go like this (indicating). And by the time he had come up, I had shot him. I really thought he had a gun. I re-live that moment every day.

*Day*, 341 S.C. at 415, 535 S.E.2d at 433. The trial judge refused to charge the jury on self-defense. However, the jury inquired about self-defense law, and in response, the judge gave a self-defense instruction.

The supreme court ruled the initial refusal to charge on self-defense was error.

> "If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial judge's refusal to do so is reversible error." *State v. Muller*, 282 S.C. 10, 316 S.E.2d 409 (1984). There is sufficient evidence in the instant case to support a charge on self-defense. Day testified he believed he was in imminent danger because he thought Renew was going to pull a gun on him. Day gave the following testimony about the fatal incident:

I pulled in and turned around and pulled in front of him [Renew] and I walked to the truck and he said something and I said something and he pulled a gun on me. I pulled Debbie's gun out and shot him in the head the first shot and I don't know where the last stuff, the first shot went.

According to Day's theory, Renew was a violent drug abuser who had a history of violence against him and others. Day knew that Renew had a tendency to violently overreact, and when he thought Renew saw Bouchillon move under the blankets, he believed he was in imminent danger and shot Renew to defend himself.

Day presented an evidence based theory as to what occurred that evening. Although some of the evidence was disputed, there was certainly enough evidence in this case to make self-defense a jury question. Defense counsel felt so strongly about the trial judge's refusal to give a self-defense instruction that she moved for a mistrial. She convincingly argued that the trial judge cast aside Day's entire defense and removed it from the jury's consideration.

. . . .

Day argues the trial judge erred by refusing to instruct the jury that Day did not have the burden of proving self-defense, and that the jury could consider past difficulties between the parties in weighing self-defense. We agree.

The trial judge initially refused to charge the jury on self-defense. However, the jury inquired about the South Carolina law on self defense. The jury wrote: "What does the State of South Carolina have to say when a person can defend themself [sic] with the use of deadly force. May we see a copy of the law concerning this?" In response, the trial judge charged the jury a standard self-defense instruction as outlined by this Court in *State v. Davis,* 282 S.C. 45, 317 S.E.2d 452 (1984) along with a specific charge on the right to act on appearances and the duty to retreat. The trial judge did not include in his instruction Day's Request to Charge Number One (factors that would give Day the right to judge Renew's conduct more harshly, including age difference, substance abuse, "bad blood", prior threats, and reputation for violence); Number Two (prior acts of violence and prior difficulties between Day and Renew); and Num-

ber Eight (the State's burden of proof when a defendant asserts self-defense).

The trial judge's failure to charge on the specific elements of self-defense that were applicable to Day's theory constitutes reversible error. As we held in *Fuller*, a trial judge should specifically tailor the self-defense instruction to adequately reflect the facts and theories presented by the defendant. *State v. Fuller*, 297 S.C. 440, 377 S.E.2d 328 (1989). A self-defense charge is erroneous where the trial court fails to charge on elements of the defense which were applicable to the issues raised by the defendant. *Id.* The trial judge's instruction in this case was incomplete. It should have included a charge indicating: (1) Day had a right to judge the conduct of Renew more harshly than otherwise because of Renew's drug consumption (Defendant's Request to Charge Number 1); and (2) the jury could consider prior instances of violence or unprovoked aggression by Renew in determining whether Day had a reasonable belief of imminent danger (Defendant's Request to Charge Number 2). Central to Day's defense was his argument that Renew had previously pulled a gun on him and that Renew was in a drug-induced paranoia the day of the incident. The jury charge was, therefore, incomplete because the trial judge failed to charge on Renew's substance abuse or his prior acts of violence. The trial judge's "after-the-fact" self-defense instruction was inadequate because defense counsel was unable to present a complete defense during her summation. In her closing argument, defense counsel could not assert self-defense, even though that was Day's theory, because she knew the trial judge was not going to adequately charge the jury. Instead, she was forced to present the facts so they implied self-defense, without actually saying the word. For example, in her closing defense counsel states:

> [Day] knew Wayne to be a violent person who would immediately take action against someone who had double-crossed him.... [H]e told you he saw Wayne's hands come down and he shot him.... Raymond Day honestly believed that he was reaching for a gun. Raymond knew that Wayne carried a gun. He knew Wayne carried the gun stuck in the waistband of his pants or under the seat

and he just seen Debbie's head pop up, he knew he had double-crossed Wayne Renew and he did what he had to do. He honestly believed that was the only course of action he could take and he pulled the gun out from his waistband where he held it and he had to shoot Wayne Renew.

Defense counsel attempted to make a case for self-defense but was restricted because she knew the jury was not going to be so charged. The trial judge belatedly recognized that a self-defense charge was necessary. Providing an "after-the-fact" instruction was inadequate because the prejudice to Day was incurable. Day was unable to adequately assert a complete defense during the trial, and the jury was left with the impression that the trial judge did not think the law of self-defense was applicable to the case.

*Day*, 341 S.C. at 416–19, 535 S.E.2d at 434–36 (alterations in original) (footnote omitted).

In *State v. Slater*, 360 S.C. 487, 602 S.E.2d 90 (Ct.App.2004), a divided court of appeals reversed the trial judge's failure to charge the jury on self-defense. Slater explained that following a school dance, he noticed a disturbance in a nearby parking lot. Slater and several friends went to the parking lot to investigate and discovered a robbery transpiring. Five men were kicking the victim as he lay on the ground. The court summarized Slater's testimony as follows:

Slater testified that he walked up to the robbery and surprised one of the attackers. The man then turned around and pointed a gun toward Slater. Slater quickly turned around and started running back toward his car. As he ran, he heard a gunshot and responded by shooting his own gun behind him. Slater got into the car where his friends were waiting for him. He continued shooting in the air as the car pulled away. In the ensuing chaos, the victim of the attempted robbery lay dying on the ground. He had been shot twice.

360 S.C. at 489, 602 S.E.2d at 92 (footnote omitted). The trial judge refused to charge the jury on self-defense. We held this was error:

Here, there was some evidence to support a self-defense charge. Slater maintains that when he approached the

altercation between the victim and his attackers, an attacker pointed a gun at Slater. Slater then turned and ran. While running away, Slater heard gunshots and returned fire, not looking in the direction where he was firing. Slater testified, "when I walked up on him, I guess I surprised him and he turned to me and he had a gun in his hand. And I see his gun and I started running." He added, "Yeah, when I walked up on him like here, like he turned to me, like had the gun pointed at me like he surprised." Additionally, Mark Nelson, a friend of the victim, testified that he saw one of the attackers—someone other than Slater—with a gun.

360 S.C. at 491, 602 S.E.2d at 93. Accordingly, we reversed.

*State v. Light,* 363 S.C. 325, 610 S.E.2d 504 (Ct.App.2005), involved the appeal of Michael Light who was convicted for murdering his girlfriend, Priscilla Davis. Light admitted to shooting Davis but claimed that Davis first threatened him with the gun: "She was pointing [the rifle] at me and screaming and hollering and accusing me as usual. . . . I was afraid she was going to shoot me." Light averred:

The only thing I remember, I did try—I took my left hand to knock it away, try to push it away from me. Than [sic] after I jerked it away from her, I did stumble back several feet, you know after jerking it. The weapon discharged but it was not intentionally.

. . . .

Q. Did she back away from you? Did you back away from her?

A. I went back from her after we was tussling with the rifle.

*Light,* 363 S.C. at 329, 610 S.E.2d at 506 (alteration in original).

The trial judge charged the jury on murder, voluntary manslaughter, and accident. Light appealed, maintaining the court erred in denying his request for a charge on self-defense. We disagreed:

Although Light vacillates in his various accounts, he stated he had disarmed Davis and taken possession of the rifle when the shot was fired. Under those facts, Davis, then unarmed, no longer posed a threat to the armed Light

and he could not have reasonably believed she did. There-
fore, the evidence demonstrates he did not have the right to
use deadly force in self-defense and the trial court properly
refused to so charge the jury.

*Light,* 363 S.C. at 333, 610 S.E.2d at 508.

A review of the foregoing precedent demonstrates the trial
judge should have charged the jury on self-defense. The
standard for giving a self-defense charge is critical in this
case.

The evidence presented at trial determines the law to be
charged. *State v. White,* 361 S.C. 407, 412, 605 S.E.2d 540,
542 (2004); *State v. Light,* 363 S.C. 325, 330, 610 S.E.2d 504,
506 (Ct.App.2005). An appellate court will not reverse the
trial judge's decision regarding jury charges absent an abuse
of discretion. *State v. Williams,* 367 S.C. 192, 624 S.E.2d 443
(Ct.App.2005). However, if there is any evidence to support a
jury charge, the trial judge should grant the requested charge.
*Burriss,* 334 S.C. at 262, 513 S.E.2d at 108. "If there is **any
evidence** in the record to support self-defense, the issue
should be submitted to the jury." *State v. Burkhart,* 350 S.C.
252, 260, 565 S.E.2d 298, 302 (2002) (emphasis added); *accord
Day,* 341 S.C. at 416, 535 S.E.2d at 434; *Burriss,* 334 S.C. at
262, 513 S.E.2d at 108 (1999); *Hill,* 315 S.C. at 261, 433 S.E.2d
at 849; *State v. Muller,* 282 S.C. 10, 10, 316 S.E.2d 409, 409
(1984); *cf. Goodson,* 312 S.C. at 280, 440 S.E.2d at 372
(noting a self-defense charge is not required unless the evi-
dence supports it).

In general, the trial judge is required to charge only the
current and correct law of South Carolina. A jury charge is
correct if it contains the correct definition of the law when
read as a whole. The substance of the law must be charged
to the jury, not particular verbiage. Current law requires
the State to disprove self-defense, once raised by the defen-
dant, beyond a reasonable doubt. Finally, to warrant rever-
sal, a trial judge's refusal to give a requested charge must
be both erroneous and prejudicial.

*Burkhart,* 350 S.C. at 261, 565 S.E.2d at 302–03 (internal
quotation marks and citations omitted). The trial court com-
mits reversible error if it fails to give a charge on an issue
raised by the evidence and requested by the defendant. *Hill,*

315 S.C. at 262, 433 S.E.2d at 849; *State v. Lee,* 298 S.C. 362, 364, 380 S.E.2d 834, 836 (1989). "If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial judge's refusal to do so is reversible error." *Day,* 341 S.C. at 416–17, 535 S.E.2d at 434 (citing *State v. Muller,* 282 S.C. 10, 316 S.E.2d 409 (1984)).

First, there is evidence that Santiago was not at fault in bringing about the difficulty. The trial judge stated that "the only difficulty that existed—the defendant has testified regarding the only difficulty was that Mr. Wisn was swearing at him, wasn't threatening. Just said, stay away from my daughter; stay away from my house." I disagree with the court's characterization of the evidence. Santiago and Wisn went into the house to search for Santiago's belt, but the encounter soon deteriorated with Wisn yelling at Santiago: "And he walked down the steps down in the driveway with me but the whole time he's—it's like screaming and—at my back, don't—you know, don't ever come on my fucking property again and stay the fuck away from my daughter." According to Santiago, "I didn't even stop to pick up my stuff. Because I ain't even gonna stop with that dude behind me." However, Wisn picked up Santiago's belongings, walked to the back of Santiago's car, and "threw the plastic container in the trunk. And then he threw in the garden hose in the trunk. All the while he's still cursing at me." Wisn then spotted the shotgun. According to Santiago, Wisn "looked over at my gun, and then he looked back at me. And then he looked at the gun again and stopped." Santiago snatched up the shotgun and began backing away, but Wisn pursued him: "[H]e turned towards me and said, 'Don't be fucking stupid,' like that, **like he was gonna grab it.**" (Emphasis added.) On cross-examination, Santiago explained, "[H]e said, 'Don't be fucking stupid.' And he didn't say to like protect me from myself. He said it as an insult and he was coming from—**with his hands in the thing [sic] towards me and stepping towards me at the same time.**" (Emphasis added.) Thus, in addition to the hostile words, Wisn threw Santiago's things into his trunk and eyed the gun. The fact that Santiago picked up the gun does not negate his self-defense claim because a defendant "has the right to act under the law of self-preservation and prevent his

[adversary from] getting the drop on him." *Starnes*, 340 S.C. at 322, 531 S.E.2d at 913. It would be absurd for the law to require Santiago to wait for Wisn, a man twice Santiago's size, to grab for the gun before Santiago could reach for it. Most importantly, as Santiago stepped away, Wisn advanced towards him, reaching for the gun. Santiago's version of the events sufficiently establishes some evidence that Santiago was not at fault in bringing about the difficulty.

Second, Santiago believed he was in imminent danger. On direct examination, counsel asked, "What was going through your mind at the time" of the shooting. Santiago replied, "I did not want to be killed. And I didn't want to be killed by my own gun. And this dude is twice as big as me and if he grabbed it, there's no way I could wrestle it away from him." The circuit judge apparently found that Santiago actually believed he was in imminent danger of losing his life or sustaining serious bodily injury when he picked up the gun, but found that "clearly at the point in time that he has the gun and he has backed away from Mr. Wisn, then he is no longer, can no longer be in imminent danger." This was error. The question is whether Santiago continued to believe he was in imminent danger between the time he picked up the gun and the time he shot Wisn. According to Santiago, that window of time lasted a "second," and during that short span of time Wisn was advancing towards Santiago. Santiago's testimony constitutes evidence he actually believed he was in imminent danger when he shot Wisn.

Third, the trial judge opined, "I do not believe there's evidence in this record that a reasonably prudent person of ordinary firmness and courage would entertain the same belief" of imminent danger. However, there is evidence that a reasonably prudent person of ordinary firmness and courage would have entertained the belief he was in imminent danger. In *Hill*, our supreme court stated that "size differential between [the defendant] and the victim is evidence which would allow a reasonably-prudent individual of ordinary firmness and courage to entertain the same belief about the danger." 315 S.C. at 262, 433 S.E.2d at 849. The State did not dispute Santiago's testimony that Wisn was "twice as big" as Santiago. Additionally, the harsh way in which Wisn spoke to Santiago, coupled with Wisn's acts of following Santiago to his car,

throwing his belongings into the trunk, and stepping toward him is evidence that a reasonably prudent person would entertain a fear of imminent danger. The trial judge did not state any specific reasons why she believed Santiago's fear was unreasonable under the reasonably prudent person standard.

Finally, Santiago had no other probable means of avoiding the danger. Santiago left the house, but Wisn followed him. The judge concluded that once Santiago had the gun, he "was exercising a means of avoiding the danger, which means at that point there could be no justification in even proceeding to shoot Mr. Wisn four times." This conclusion, however, ignores Santiago's testimony that Wisn continued to come toward him. Santiago attempted to retreat up the point where Wisn was about to come into physical contact with him. These facts make the instant case distinguishable from *Light*. In *Light*, the defendant wrestled a gun away from his girlfriend and testified that after he obtained control of the gun he stumbled back "several feet" when the gun accidentally discharged. 363 S.C. at 329, 610 S.E.2d at 506. The court concluded that once Light had disarmed the victim, she "no longer posed a threat to the armed Light and he could not have reasonably believed she did." *Id.* at 333, 610 S.E.2d at 508. Significantly, Light did not claim that he shot the victim as she was advancing toward him, but maintained that the shooting was accidental. Thus, there was no evidence in *Light* that the victim posed a threat of imminent harm to Light at the moment she was shot. Here, Wisn was allegedly advancing toward Santiago when Santiago shot him. The evidence suggests that Santiago reached the point of retreat where he had to discharge the gun or be overpowered by Wisn.

For the purposes of determining whether a charge on the law of self-defense is warranted, Santiago's credibility is not relevant. The court should look only to whether **any** evidence exists to support the charge. Where, as here, the defense introduces some evidence to support the charge, it is the jury's responsibility to determine whether the defendant's account of the events is believable and whether his actions were truly in self-defense. In the case *sub judice*, the trial judge committed reversible error by invading the province of the jury and failing to give a self-defense charge. The failure to charge is

patently prejudicial and is reversible error as a jury could have found Santiago was justified in killing Wisn. *See Day,* 341 S.C. at 416–17, 535 S.E.2d at 434 ("If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial judge's refusal to do so is reversible error.").

## II. Relevance of Schwartz–Watts's Testimony

I agree with the majority that the trial judge correctly excluded the testimony as to Santiago's mental state during the commission of the crime. However, the trial judge incorrectly excluded Dr. Schwartz–Watt's testimony as to the voluntariness of Santiago's confession.

### A. Diminished Capacity

Schwartz–Watts would have opined that Asperger's Disorder caused Santiago to fear for his life and that consequently, he did not have the requisite mental state to commit murder. However, the diminished capacity defense is not recognized in South Carolina.

South Carolina Code Annotated section 17–24–10 (2003) provides an affirmative defense if, "at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong." In addition to an insanity defense, certain jurisdictions acknowledge what Professor LaFave calls "partial responsibility"—a doctrine applicable to a defendant who

> may have been suffering from an abnormal mental condition which was not of a kind or character to afford him a successful insanity defense under the right-wrong test or other standard applicable in that jurisdiction. But, while this defendant is therefore ineligible for a finding of not guilty by reason of insanity, his mental abnormality may nonetheless be a most relevant consideration in the determination of whether he is guilty of the crime charged.

Wayne R. LaFave, *Substantive Criminal Law* § 9.2. Our courts, however, have clearly rejected application of the concept.

In *Gill v. State,* 346 S.C. 209, 552 S.E.2d 26 (2001), a forensic psychiatrist, Morgan, testified that Gill had a borderline intellectual capacity and possessed an antisocial personality. Dr. Morgan asseverated Gill could not formulate malice aforethought. Gill requested a charge on diminished capacity, which the trial judge refused. The supreme court held diminished capacity is not recognized in South Carolina:

The diminished capacity doctrine allows a defendant to offer evidence of his mental condition with respect to his capacity to achieve the *mens rea* required for the commission of the offense charged. 21 Am.Jur.2d *Criminal Law* § 38 (1998). In particular, the defense may be invoked to negate specific intent, where such intent is an element of the offense charged. *Id.* Diminished capacity differs from the insanity defense in that it may be raised by a defendant who has conceded to be legally sane. *Id.*

The trial judge did not err by refusing to charge diminished capacity because it is not recognized in South Carolina. Furthermore, according to this Court in *State v. Fuller,* 229 S.C. 439, 93 S.E.2d 463 (1956), a defendant is not entitled to an instruction concerning his capacity to form the requisite intent for malice aforethought when the instructions, taken as a whole, properly present elements of malice. Gill received proper jury charges on murder, voluntary manslaughter, ABIK, insanity, and self defense. These jury charges, taken as a whole, were sufficient because they adequately presented the elements of malice as recognized by South Carolina law.

*Gill,* 346 S.C. at 220, 552 S.E.2d at 32.

Schwartz–Watts sought to establish that due to Santiago's Asperger's Disorder, he did not have possess the mental state required for murder—in other words, that Santiago suffered from a diminished mental capacity. The trial judge did not abuse her discretion by refusing to allow this testimony.

## B. Voluntariness of Santiago's Confession to Police

### 1. Proffer of the Expert's Testimony

The defense requested that the court allow Schwartz–Watts to testify as to her opinion that Santiago's Asperger's Disorder

rendered his confession involuntarily. Specifically, counsel stated,

The third and final proffer would be for her [explanation of] Chris' affect and appearance in court and his dealing with his issuing a statement as he did based on his perceptions of his not being treated well, being messed with, his rights violated, et cetera, et cetera.

Defense counsel did not proffer Schwartz–Watts's testimony, but rather informed the trial judge of what her testimony would have been. Generally, a proffer of testimony is required to preserve the issue of whether testimony was properly excluded by the trial judge, and an appellate court will not consider error alleged in the exclusion of testimony unless the record on appeal shows fairly what the excluded testimony would have been. *State v. Roper,* 274 S.C. 14, 20, 260 S.E.2d 705, 708 (1979); *State v. Cox,* 258 S.C. 114, 117, 187 S.E.2d 525, 527 (1972); *State v. King,* 367 S.C. 131, 623 S.E.2d 865 (Ct.App.2005). Here, although defense counsel should have proffered Schwartz–Watts's testimony, I find the record adequately indicates what her testimony would have been. Therefore, in my view, this issue is preserved for review.

### 2. Admissibility of Confessions

A confession is not admissible unless it was voluntarily made. *State v. Von Dohlen,* 322 S.C. 234, 243, 471 S.E.2d 689, 694 (1996); *State v. Compton,* 366 S.C. 671, 680, 623 S.E.2d 661, 666 (Ct.App.2005); *see also State v. Childs,* 299 S.C. 471, 475, 385 S.E.2d 839, 842 (1989) ("The test of admissibility of a statement is voluntariness."). "An accused's involuntary statement is inadmissible for any purpose, including impeachment." *State v. Victor,* 300 S.C. 220, 223, 387 S.E.2d 248, 249 (1989); *see also State v. Hook,* 348 S.C. 401, 559 S.E.2d 856 (Ct.App.2001), *aff'd as modified,* 356 S.C. 421, 590 S.E.2d 25 (2003). The voluntariness requirement is in addition to the intelligent waiver mandate of *Miranda. See State v. Middleton,* 288 S.C. 21, 25, 339 S.E.2d 692, 694 (1986) ("In order to secure the admission of a defendant's statement, the State must affirmatively show the statement was voluntary *and* taken in compliance with *Miranda.*") (citations omitted). "It is now axiomatic ... that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in

whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

The requirement that only voluntary confessions be admitted is based on the Fifth Amendment's right against self-incrimination, and was incorporated and made applicable to the States through the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."). In *Hook*, this Court explained:

> The Fifth Amendment to the United States Constitution provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This provision governs state as well as federal criminal proceedings. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Article 1, Section 12, of the South Carolina Constitution contains a similar provision. S.C. Const. Art. I, § 12 (". . . nor shall any person be compelled in any criminal case to be a witness against himself.").

> The Fifth Amendment does not, of course, operate as a blanket prohibition against the taking of any and all statements made by criminal defendants to law enforcement officials. Volunteered statements, whether exculpatory or inculpatory, stemming from custodial interrogation or spontaneously offered up, are not barred by the Fifth Amendment. *State v. Kennedy*, 325 S.C. 295, 307, 479 S.E.2d 838, 844 (Ct.App.1996) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

*Hook*, 348 S.C. at 409–10, 559 S.E.2d at 860. In *Hook* we observed that the "concept that the privilege against self-incrimination encompasses the right to be free from being penalized for its exercise is well established." *Id.* at 411, 559 S.E.2d at 861 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) ("[W]hen a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimo-

ny is obtained in violation of the Fifth Amendment and cannot be used against the declarant in a subsequent criminal prosecution.... Similarly, our cases have established that a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.")). The United States Supreme Court, in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), elucidated the rationales behind the prohibition against involuntary confessions:

It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' *Blackburn v. Alabama,* 361 U.S. 199, 206–207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, and because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' *Spano v. New York,* 360 U.S. 315, 320–321, 79 S.Ct. 1202, 1205–1206, 3 L.Ed.2d 1265.

*Jackson v. Denno,* 378 U.S. at 385–86, 84 S.Ct. 1774.

### 3. Voluntariness Determinations

The process for determining whether a statement is voluntary, and thus admissible, is bifurcated: it involves determinations by both the judge and the jury. First, the trial judge must conduct an evidentiary hearing, outside the presence of the jury, where the State must show the confession was voluntarily made by a preponderance of the evidence.

Under *Jackson v. Denno,* a defendant is entitled to a "reliable determination as to the voluntariness of his confession by a tribunal other than the jury charged with deciding his guilt or innocence." *State v. Fortner,* 266 S.C. 223, 226, 222 S.E.2d 508, 510 (1976). "A defendant in a criminal case is entitled to an independent evidentiary hearing to determine the voluntariness of statements made by the defendant prior

to the submission of such statements to the jury." *State v. Salisbury*, 330 S.C. 250, 271, 498 S.E.2d 655, 666 (Ct.App. 1998), *aff'd as modified*, 343 S.C. 520, 541 S.E.2d 247 (2001); *see also State v. Creech*, 314 S.C. 76, 84, 441 S.E.2d 635, 639 (Ct.App.1993) ("Whenever evidence is introduced that was allegedly obtained by conduct violative of a defendant's constitutional rights, the defendant is entitled to have the trial judge conduct an evidentiary hearing outside of the presence of the jury at the threshold point to establish circumstances under which it was gained."). "In South Carolina, the judge makes this initial determination of voluntariness required by *Jackson v. Denno* [.]" *Fortner*, 266 S.C. at 226–27, 222 S.E.2d at 510.

The State bears the burden of showing the confession was voluntary. *Von Dohlen*, 322 S.C. at 243, 471 S.E.2d at 695; *Washington*, 296 S.C. at 55, 370 S.E.2d at 612; *State v. Neeley*, 271 S.C. 33, 244 S.E.2d 522 (1978); *see also Middleton*, 288 S.C. at 24, 339 S.E.2d at 694 ("In order to secure the admission of a defendant's statement, the State must affirmatively show the statement was voluntary *and* taken in compliance with *Miranda.*").

In *State v. Washington*, 296 S.C. 54, 370 S.E.2d 611 (1988), our supreme court addressed the standard of proof applicable to the *Jackson v. Denno* hearing:

"It has been uniformly held, a confession may be introduced upon proof of its voluntariness *by a preponderance of the evidence.*" *State v. Smith*, 268 S.C. 349, 354, 234 S.E.2d 19, 21 (1977) (Emphasis supplied).

"(T)he burden is on the State to prove *by a preponderance of the evidence* that his rights were voluntarily waived." *State v. Neeley*, 271 S.C. 33, 40, 244 S.E.2d 522, 526 (1978) (Emphasis supplied).

"(T)he prosecution must prove … *by a preponderance of the evidence* that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627 (1972) (Emphasis supplied).

*See also Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *State v. Middleton*, 295 S.C. 318, 368 S.E.2d 457 (1988); *In re Christopher W.*, 285 S.C. 329, 329 S.E.2d 769 (Ct.App.1985).

*Washington,* 296 S.C. at 55, 370 S.E.2d at 612. *Accord State v. Kennedy,* 325 S.C. 295, 479 S.E.2d 838 (Ct.App.1996).

During the *Jackson v. Denno* hearing, the trial judge must examine the totality of the circumstances surrounding the confession and determine whether the State has carried its burden of showing the confession was voluntarily made. *State v. Childs,* 299 S.C. 471, 475, 385 S.E.2d 839, 842 (1989); *State v. Doby,* 273 S.C. 704, 708, 258 S.E.2d 896, 899 (1979) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

Once the trial judge determines that the confession is admissible, it is up to the jury to ultimately determine whether the confession was voluntarily made. *Von Dohlen,* 322 S.C. at 243, 471 S.E.2d at 695; *State v. Callahan,* 263 S.C. 35, 41, 208 S.E.2d 284, 286 (1974) ("A confession is not admissible unless voluntary, and it [is] for the jury to say in the last analysis whether the confession [is] or [is] not voluntary."); *State v. Clinkscales,* 231 S.C. 650, 653, 99 S.E.2d 663, 664 (1957) ("Although all the evidence may be to the effect that a confession made while under arrest was a voluntary one, the jury may not be so convinced; and it is the jury who, in the final analysis, must determine the factual issue of voluntariness."); *State v. Brown,* 212 S.C. 237, 246, 47 S.E.2d 521, 525 (1948).

> Nothing in [*Jackson v. Denno* ] questioned the province or capacity of juries to assess the truthfulness of confessions. Nothing in that opinion took from the jury any evidence relating to the accuracy or weight of confessions admitted into evidence. A defendant has been as free since *Jackson* as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness.

*Lego v. Twomey,* 404 U.S. 477, 485–86, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Thus, the jury is entitled to consider the totality of the circumstances surrounding the confession to determine whether the confession was voluntarily made. *State v. Vang,* 353 S.C. 78, 84, 577 S.E.2d 225, 227–28 (Ct.App. 2003).

> Confessions, even those that have been found to be voluntary, are not conclusive of guilt.... Indeed, stripped of the

power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

*Crane v. Kentucky,* 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted).

### 4. Totality of the Circumstances Test

The test of voluntariness is " 'whether a defendant's will was overborne' by the circumstances surrounding the given confession. The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " *Dickerson v. United States,* 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (citations omitted); *State v. Aleksey,* 343 S.C. 20, 30, 538 S.E.2d 248, 253 (2000); *State v. Linnen,* 278 S.C. 175, 179, 293 S.E.2d 851, 853 (1982); *State v. Gillian,* 360 S.C. 433, 458, 602 S.E.2d 62, 76 (Ct.App.2004); *see also State v. Myers,* 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004) ("A determination whether a confession was 'given voluntarily requires an examination of the totality of the circumstances.' ") (citation omitted); *State v. Compton,* 366 S.C. 671, 680, 623 S.E.2d 661, 666 (Ct.App.2005) ("The test for determining the admissibility of a statement is whether it was knowingly, intelligently, and voluntarily given under the totality of the circumstances.") (internal quotation marks and citation omitted). " 'The trial judge's determination of the voluntariness of a statement must be made on the basis of the totality of the circumstances, including the background, experience and conduct of the accused.' " *State v. Ledford,* 351 S.C. 83, 87, 567 S.E.2d 904, 906 (Ct.App.2002) (quoting *State v. Franklin,* 299 S.C. 133, 138, 382 S.E.2d 911, 914 (1989)); *accord Childs,* 299 S.C. 471, 475, 385 S.E.2d 839, 842 (1989); *State v. Corns,* 310 S.C. 546, 552, 426 S.E.2d 324, 327 (Ct.App.1992). "A jury

must consider the totality of the circumstances under which a statement was given to determine whether it was voluntarily made." *State v. Vang,* 353 S.C. 78, 84, 577 S.E.2d 225, 227–28 (Ct.App.2003) (citing *State v. Torrence,* 305 S.C. 45, 52, 406 S.E.2d 315, 319 (1991) ("[T]he jury should be instructed that they must find beyond reasonable doubt that the statement was freely and voluntarily given under the totality of the circumstances before the statement may be considered.")). The State must prove to the jury that the statement was voluntary beyond a reasonable doubt. *State v. Washington,* 296 S.C. 54, 55–56, 370 S.E.2d 611, 612 (1988) (citing *State v. Drayton,* 287 S.C. 226, 337 S.E.2d 216 (1985); *State v. Adams,* 277 S.C. 115, 283 S.E.2d 582 (1981)).

Coercive police activity is a necessary predicate to finding a confession is not voluntary. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Linnen,* 278 S.C. 175, 293 S.E.2d 851; *Salisbury,* 330 S.C. 250, 498 S.E.2d 655. Coercion is determined from the perspective of the suspect. *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). The Supreme Court, in *Withrow v. Williams,* 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), set forth a non-exclusive list of factors which may be considered in the totality-of-the-circumstances analysis:

Under the due process approach ... courts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion, *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); the length of the interrogation, *Ashcraft v. Tennessee,* 322 U.S. 143, 153–154, 64 S.Ct. 921, 925–926, 88 L.Ed. 1192 (1944); its location, see *Reck v. Pate,* 367 U.S. 433, 441, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961); its continuity, *Leyra v. Denno,* 347 U.S. 556, 561, 74 S.Ct. 716, 719, 98 L.Ed. 948 (1954); the defendant's maturity, *Haley v. Ohio,* 332 U.S. 596, 599–601, 68 S.Ct. 302, 303–305, 92 L.Ed. 224 (1948) (opinion of Douglas, J.); education, *Clewis v. Texas,* 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967); physical condition, *Greenwald v. Wisconsin,* 390 U.S. 519, 520–521, 88 S.Ct. 1152, 1153–1154, 20 L.Ed.2d 77 (1968) (*per curiam* ); and mental health, *Fikes v. Alabama,* 352 U.S. 191, 196, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957).

They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation. *Haynes v. Washington,* 373 U.S. 503, 516–517, 83 S.Ct. 1336, 1344–1345, 10 L.Ed.2d 513 (1963)[.]

*Withrow,* 507 U.S. at 693–94, 113 S.Ct. 1745. *See also Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, e.g., *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; his lack of education, e.g., *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); or his low intelligence, e.g., *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, e.g., *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; the length of detention, e.g., *Chambers v. Florida, supra* [309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940) ]; the repeated and prolonged nature of the questioning, e.g., *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as the deprivation of food or sleep, e.g., *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut, supra,* 367 U.S.,[568] at 603, 81 S.Ct.,[1860] at 1879[, 6 L.Ed.2d 1037 (1961) ].") (footnote omitted).

The appellate entities of South Carolina have recognized that appropriate factors include: background, experience, and conduct of the accused; age; length of custody; police misrepresentations; isolation of a minor from his or her parent; threats of violence; and promises of leniency. *See Childs,* 299 S.C. at 475, 385 S.E.2d at 842 (background, experience, and conduct of the accused); *In re Williams,* 265 S.C. 295, 217 S.E.2d 719 (1975) (age); *State v. Jennings,* 280 S.C. 62, 309 S.E.2d 759 (1983) (length of custody); *State v. Rabon,* 275 S.C. 459, 461, 272 S.E.2d 634, 635 (1980) (police misrepresenta-

tions); *State v. Smith,* 268 S.C. 349, 355, 234 S.E.2d 19, 21 (1977) (isolation of minor); *State v. Rochester,* 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990) (threats of violence and promises of leniency).

Furthermore, our courts have recognized the relevance of a factor which is crucial to the determination of this case: the mental state of the accused.

In *State v. Cain,* 246 S.C. 536, 144 S.E.2d 905 (1965), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) (abrogating the doctrine of in favorem vitae), Hershel Cain was convicted of murder and sentenced to death. The victim, who owned a grocery store and filling station, was found lying on the floor of his store, dead from a gunshot wound to the chest. Police arrested Cain two days later and he confessed to the murder. The officer who took Cain's statement testified to the facts surrounding the confession. "[A]t the time the confession was admitted in evidence, the sole testimony before the trial Judge was that such confession had been freely and voluntarily made by the appellant. There was no testimony to the contrary." 246 S.C. at 539, 144 S.E.2d at 906. However, prior to the shooting, a doctor diagnosed Cain with a mental condition—"schizophrenic reaction of the paranoid type." *Id.* Cain contended

> that the court should have excluded from the evidence the statement or confession signed by the appellant because the appellant, at the time of the making of said confession, was a suspect, was under arrest, and was not provided with counsel; and that at the time of the making of said confession, the appellant was disoriented, having been a patient in the State Hospital prior to the alleged confession and again within five days after making such confession.

246 S.C. at 541, 144 S.E.2d at 907. The court found that the confession was admissible, but reversed Cain's convictions because the judge failed to charge the jury as to its role in determining the voluntariness of Cain's confession.

> At the time the confession of the appellant was offered and admitted into evidence, even though the confession was taken while the appellant was in custody, all of the evidence showed that the said confession, as made, was a free and voluntary one, and there was no evidence to contradict the

*prima facie* showing made by the State. *State v. Sharpe,* 239 S.C. 258, 122 S.E.2d 622 [1961]. The lack of mental capacity is an important factor to be considered with other factors in determining whether, in fact, a purported confession was voluntary. *Blackburn v. State of Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. The appellant had the right to introduce evidence of his insanity at the time of his confession for the purpose of impairing or destroying its effect and it was for the jury to determine what weight should be accorded thereto. We think the confession was admissible in evidence.

. . . .

The record in this case shows that the trial Judge failed to give any instructions whatsoever as to the rules governing confessions. We think this was prejudicial error. The question of whether the appellant was mentally capable of making a confession and understood the contents of his statement and freely and voluntarily executed it should have been submitted to the jury under appropriate instructions. *State v. Gardner,* 219 S.C. 97, 64 S.E.2d 130 [1951], and *State v. Clinkscales,* 231 S.C. 650, 99 S.E.2d 663. We quote from the last cited case:

'Although all the evidence may be to the effect that a confession made while under arrest was a voluntary one, the jury may not be so convinced; and it is the jury who, in the final analysis, must determine the factual issue of voluntariness. *State v. Miller,* 211 S.C. 306, 45 S.E.2d 23 [1947]; *State v. Gardner,* 219 S.C. 97, 64 S.E.2d 130. *Cf. State v. Harris,* 212 S.C. 124, 46 S.E.2d 682 [1948]. Similarly, even though a jury accepts a written confession as having been voluntarily made, it is not thereby bound to accept every statement contained in it as true; for it is the sole judge of its credibility, and may believe it all, or in part, or not at all. It is unreasonable to assume that these matters are within the knowledge of the average juror; he should be informed of them by the Court. Whether such instruction would have altered the verdict in this case is a matter upon which we need not speculate; since life is at stake the case should be remanded, so that upon its retrial the jury may be instructed as to their power, as sole judges of the facts to determine whether or

not, under the evidence, the confession was voluntary, and to what extent they will give it credence.'

We think that in all fairness to the trial Judge it should be stated that he was not requested to instruct the jury on the subject of confessions. However, under the well recognized practice of this Court, where the death penalty is involved, these omissions on the part of counsel will not be held to waive the rights of the appellant.

The judgment of the lower Court is reversed and this case remanded for a new trial.

*Cain,* 246 S.C. at 541–42, 144 S.E.2d at 907–08.

In *State v. Callahan,* 263 S.C. 35, 208 S.E.2d 284 (1974), Callahan confessed to rape, robbery, and burglary. He was indicted, and a jury convicted him of all charges. His confession was the basis for his appeal. The trial judge heard in camera testimony from a psychiatrist, Dr. Forsthoefel, who "had diagnosed the defendant as 'mental retardation moderate.'" *Id.* at 39–40, 208 S.E.2d at 285. Dr. Forsthoefel

testified somewhat at length as to his ability to think and reason under stress. He said that the defendant 'when subjected to even mild stress would become very labile, excitable and disorganized in his thinking and upset.' He did not testify that the defendant did not know legal right from legal wrong.

263 S.C. at 40, 208 S.E.2d at 285.

After hearing additional testimony, the judge concluded Callahan's confession " 'was freely and voluntarily made after the defendant had been accorded all of his Constitutional rights.'" 263 S.C. at 40, 208 S.E.2d at 286. The issue of voluntariness became a question of fact for the jury, and accordingly, the State and Callahan proceeded to offer testimony relating to the confession before the jury.

After the State had again submitted its witnesses on the voluntariness issue, and while counsel for the defendant was again presenting his witnesses to the contra, Dr. Forsthoefel was again called to the stand and testified. He said that his diagnosis was that the defendant "is moderate mental retardation, I.Q. range of 55 to 65 at the most."

The record then reflects the following:

"Q. Do you have an opinion as to his ability to think or reason under stress?

"A. Yes, I do have an opinion."

The solicitor objected to this question and the judge sustained the objection. Later, defense counsel asked this question:

"Q. Okay, Doctor, do you have an opinion as to his quality of thinking?"

"A. His quality of thinking . . ."

The trial judge interrupted and did not permit the witness to continue to answer.

263 S.C. at 40, 208 S.E.2d at 286.

The issue for the *Callahan* court was "whether the defendant was prejudiced by denial of the right to further pursue the question of mental capacity" in the jury's presence. *Id.* The court held the trial judge erred by refusing to allow the psychiatrist's answers:

A confession is not admissible unless voluntary, and it was for the jury to say in the last analysis whether the confession was or was not voluntary. In *State v. Cain*, 246 S.C. 536, 144 S.E.2d 905 (1965), this Court held, "The lack of mental capacity is an important factor to be considered with other factors in determining whether, in fact, a purported confession was voluntary." Accordingly, the defendant was entitled to submit evidence of the psychiatrist touching on the defendant's mental capacity and it would have been appropriate to allow both questions quoted hereinabove.

263 S.C. at 41, 208 S.E.2d at 286. However, the court found no prejudice from the error because the jury heard other testimony of Callahan's mentality. *Id.* at 43, 208 S.E.2d at 287 ("To exclude the testimony of Dr. Forsthoefel was inconsistent with our reasoning in Cain, but we think that the jury was fully apprised of the fact that the defendant was of very low mentality short of insanity.").

In *State v. Doby*, 273 S.C. 704, 709, 258 S.E.2d 896, 899 (1979), our supreme court recalled, " 'We have consistently held that mental deficiency alone is not sufficient to render a confession involuntary but that it is a factor to be considered along with all of the other attendant facts and circumstances

in determining the voluntariness of the confession. *State v. Cain*, 246 S.C. 536, 144 S.E.2d 905; *State v. Callahan*, 263 S.C. 35, 208 S.E.2d 284.' *In Re Williams*, 265 S.C. 295, 301, 217 S.E.2d 719, 722 (1975)."

Jennings, age twenty-two, confessed to burglarizing a home and killing the resident in *State v. Jennings*, 280 S.C. 62, 309 S.E.2d 759 (1983). Jennings had a hearing deficiency and was described as " 'mildly' retarded." *Id.* at 63, 309 S.E.2d at 759. However, the record included testimony that "the officers who questioned appellant were aware of the physical deficiencies and exercised caution to be sure that he could hear and understand the communications with him." *Id.* at 63–64, 309 S.E.2d at 760. The court considered Jennings's condition and found his confession voluntary considering the totality of the circumstances.

> Neither the length of custody before the confession was made, nor the physical deficiencies of the appellant, were conclusive of the issues concerning the voluntariness of the confession, but were factors to be considered by the trial judge, along with the other testimony and circumstances, in determining the admissibility of the alleged confession. We find no basis upon which to disturb the findings of the trial judge that the confession was freely and voluntarily made.

*Jennings*, 280 S.C. at 64, 309 S.E.2d at 760.

### 5. Relevance of Expert Testimony to the Voluntariness Analysis

Indubitably, a defendant's mental capacity is a factor that may be considered both by the court in its *Jackson v. Denno* hearing analysis, and by the jury in its voluntariness determination. Santiago sought to admit Schwartz–Watts's testimony as a means of explaining "his issuing a statement as he did based on his perceptions of his not being treated well, being messed with, his rights violated[.]" This testimony was relevant to Santiago's mental condition at the time of the confession and would have had a tendency to make more probable the allegedly involuntary nature of Santiago's confession. As the ultimate arbiter of whether Santiago's confession was voluntary, the jury was entitled to hear Schwartz–Watts's testimony. Therefore, the trial judge erred in excluding it.

194

Moreover, the error prejudiced Santiago. Because the trial judge excluded Schwartz–Watts's testimony, Santiago was unable to present the jury with evidence relevant to the voluntariness of his confession. Further, the jury was not apprised of Santiago's mental capacity through other testimony. *Cf. Callahan*, 263 S.C. at 42, 208 S.E.2d at 286 (finding error not prejudicial when the jury knew of the defendant's mental capacity through other testimony). Thus, the error was inimical to Santiago.

The trial judge erred by failing to give a self-defense charge and committed an abuse of discretion by excluding evidence relevant to the jury's voluntariness determination. Accordingly, I **VOTE** to **REVERSE** Santiago's convictions.